UNITED STATES of America

v.

David Loren FROST, Appellant.

No. 92–3579.

United States Court of Appeals,
Third Circuit.

Argued May 20, 1993.

Decided July 22, 1993.

**738**

Thomas W. Corbett, Jr., U.S. Atty., Paul J. Brysh (Argued), Asst. U.S. Atty., Gina M. Caldone, Pittsburgh, PA, for appellee.

Stanton D. Levenson (Argued), Pittsburgh, PA, for appellant.

Before: STAPLETON and ALITO, Circuit Judges and POLLAK, District Judge *.

## OPINION OF THE COURT

STAPLETON, Circuit Judge:

After the denial of his motion to have the evidence against him suppressed, appellant Frost pleaded guilty to one count of possession with intent to distribute cocaine in excess of five kilograms, and was sentenced to 120 months in a federal prison. The sole issue before us is whether the District Court erred in denying Frost's motion to suppress. We find no error and will affirm the judgment of the District Court.

### I.

On April 21, 1992, Allegheny County Police Detectives Edward Adams and Anthony Olearchick were assigned to a narcotics interdiction detail at the Greater Pittsburgh International Airport. At about 5:00 p.m., Detective Adams observed Appellant Frost disembark from a USAir flight from Ft. Lauderdale, Florida. Frost carried no luggage, and Adams noticed that Frost had bulges in the pockets of his jeans. Adams would later testify that he knew Ft. Lauderdale to be a source city for drugs and that he was aware that police officers and detectives had previously made many airport arrests of persons carrying drugs from Ft. Lauderdale.

Adams watched Frost enter a rest room and exit about 15 seconds later. Adams would testify that the practice of entering a rest room, and then exiting seconds later, is a common counter-surveillance technique. As Frost exited the rest room he looked around suspiciously as though trying to determine whether he was being followed. Frost was also pulling down his tee-shirt in what appeared to be an attempt to conceal something on his person. As Adams followed Frost along the public corridor, he observed the outline of what appeared to be cigarette rolling papers, which are used in rolling marijuana cigarettes, in Frost's back pocket. Adams phoned Detective Olearchick and met him near a snack bar area. Both Adams and Olearchick observed Frost as he again entered a rest room and exited moments later.

At this time, at about 5:20 p.m., Adams and Olearchick approached Frost, identified themselves as police officers, and asked "Is it okay if we talk with you for a few minutes?" Frost agreed to speak with them, and a conversation ensued. At the time of the conversation, the two detectives were standing side by side with their backs to a service hallway, and Frost stood facing them with his back to the main corridor. Neither detective attempted to touch Frost, and neither detective's gun was visible.

Frost related that he was coming from Ft. Lauderdale and was on his way to Lansing, Michigan. He produced his ticket folder upon request, and the detectives noticed that there was a baggage claim check attached to the ticket folder. Detective Adams recorded the information on the baggage claim check, and then returned the ticket folder to Frost. The detectives asked who paid for the ticket and Frost stated that his uncle had paid the fare. Shortly thereafter Frost stated that he had bought the ticket himself. Later, Frost said again that his uncle had bought the ticket.

* Honorable Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

As the conversation continued, Frost appeared to grow increasingly nervous. He was shifting from foot to foot and began wringing his hands. Frost related that he was in Florida to visit his uncle and, upon request, produced identification. The detectives inspected and then returned the identification.

Detective Adams then stated that he and Detective Olearchick were narcotics officers. Detective Adams stated that he had observed the large bulges in Frost's pockets. Adams asked Frost "if it would be okay with him, if he could show us what was in his pockets." Adams stated that Frost was under no obligation to comply. Frost voluntarily reached into his pockets and produced a large roll of cash from each pocket. The cash totalled $3,035, and was mostly in ten and twenty dollar bills. Frost also produced a sky pager, which is commonly used in drug trafficking. As Frost retrieved the pager from his pocket, he turned it off, which has the effect of erasing the telephone numbers recorded on the pager.

At about 5:27 p.m., the detectives asked Frost to accompany them to the airport police station in order to investigate the matter further, and Frost agreed. Frost and Olearchick then proceeded the 1500 feet to the airport police station, while Adams went to retrieve Frost's suitcase. Adams arrived at the station with the suitcase at about 5:40 p.m. There was a padlock on the suitcase.

When Adams arrived, Frost and Olearchick were seated in the interview room. Frost identified the suitcase as his own, but claimed he did not know how a padlock had become attached to the suitcase. Adams asked Frost if he would consent to a search of the suitcase, and Frost refused. At approximately 5:55 p.m., Adams informed Frost that they would call in a drug-sniffing dog to inspect the suitcase and the money, and that they would attempt to secure a search warrant for the suitcase.

At approximately 6:00 p.m., the detectives attempted to bring in a drug-sniffing dog and its handler. Because no canine drug detection unit was on duty that day, one had to be summoned to the airport. At approximately this time, the detectives also verified Frost's identification and found that he had no outstanding arrest warrants. Detective Olearchick phoned the police department in the Emmett Charter Township, Michigan, and was informed by a police officer there that Frost was arrested in 1990 for possession of a "large amount of marijuana." Olearchick phoned the police office in downtown Pittsburgh which verified, by computer, that Frost had a 1990 felony arrest for possession of marijuana. Frost would later assert that the 1990 offense resulted in a conviction for a marijuana misdemeanor.

The detectives informed Frost that he was free to leave or remain while they attempted to get a search warrant. Frost told the detectives that there were no narcotics in the bag, threatened to file a law suit against them, and then stated that he wanted to catch the next flight to Lansing. The detectives gave Frost receipts for the suitcase, the cash and the pager, and instructed him on how to retrieve the items if the detectives failed to get a search warrant or if no drugs were found. Frost left the station at approximately 6:55 p.m. and subsequently boarded a flight to Lansing.

A few minutes after Frost's departure from the station, the dog and its handler arrived, and the dog sniff took place at approximately 7:00 p.m. The dog "alerted" to the cash, but not the suitcase. The detectives then drafted and signed an affidavit to be submitted in support of an application for a search warrant. The affidavit mentioned that the dog alerted to the cash, but did not mention that the dog was exposed to, and did not alert to, the suitcase. The affidavit also mentioned that Frost's felony arrest in 1990 was for a "large amount of marijuana." A district justice issued a search warrant at 7:55 p.m.

Upon obtaining the warrant, the detectives searched the suitcase and found ten one-kilogram packages of cocaine. Each package was sealed in a plastic bag, covered with tape, sealed in another plastic bag, wrapped in a layer of aluminum foil and a layer of duct tape, smeared with axle grease, and wrapped in yet another layer of plastic wrap and duct tape.

Frost was then removed from his flight to Lansing, which had yet to depart, and returned to the airport police station at 9:15 p.m. where he was advised of his *Miranda* rights. Frost signed a written waiver of his rights and gave a detailed statement admitting that he had been a cocaine courier for about one year, and that he had earned $150,000 to $180,000 profit.

Before the District Court, Frost moved to suppress the cocaine and his incriminating statements and offered three arguments in favor of suppression. Frost claimed that an unconstitutional seizure occurred at his first encounter with the detectives, that the detectives violated his privacy interest in his luggage by taking too long to submit the luggage to the dog sniff, and that the search warrant lacked probable cause because the affidavit omitted the fact that the dog had not alerted to the suitcase and also because the affidavit misrepresented the amount of marijuana that was involved in Frost's prior incident.

The District Court denied the motion to suppress. Frost then pleaded guilty to one count of possession with intent to distribute cocaine in excess of five kilograms, and was sentenced to 120 months imprisonment. Frost brought this appeal of the District Court's judgment to deny the motion to suppress, asserting the same three arguments he offered in initial support of the motion.

## II.

### A.

■ Frost's first argument is that he was unconstitutionally seized at the point he first encountered Detectives Adams and Olearchick. We disagree.

The Supreme Court has set forth an objective standard for determining whether a person has been "seized" for the purposes of the Fourth Amendment: "We conclude that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). *See*

*also Florida v. Bostick,* — U.S. —, —, 111 S.Ct. 2382, 2387, 115 L.Ed.2d 389 (1991) ("When police attempt to question a person who is walking down the street or through an airport lobby, it makes sense to inquire whether a reasonable person would feel free to continue walking.")

The District Court concluded that a reasonable person in Frost's circumstances would have felt free to leave at the initial point of the encounter, and we concur in that conclusion. The detectives approached Frost and asked "Is it okay if we talk with you for a few minutes?" There is no evidence of any attempts at coercion or intimidation by the officers. Frost may easily have declined the officers' invitation and continued to walk along the public corridor. The record indicates that Frost voluntarily complied with the officers' requests for his ticket information and identification. Perhaps most importantly, the record indicates that the detectives made it clear that Frost could refuse to comply with their request to empty his pockets and that Frost nevertheless voluntarily complied with that request. We thus find no "seizure" at the point of initial contact between Frost and the detectives.

### B.

Frost next argues that the detectives took too long to have his luggage inspected by a drug-sniffing dog, thereby interfering with his privacy interest in the luggage.

It is established that when a police officer or other law enforcement officer takes a piece of luggage from a person, a "seizure" within the meaning of the Fourth Amendment occurs. *United States v. Place,* 462 U.S. 696, 707, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). In *Place,* the Supreme Court analogized temporary seizures of persons, which were found to be constitutional in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), to temporary seizures of luggage, holding that the temporary seizure of luggage is constitutional so long as the seizure is not overly intrusive upon the person's privacy interest in the property, and so long as the property is not detained for a long period of time. The Court noted that "because of

the inherently transient nature of drug courier activity at airports, allowing police to make brief investigative stops of persons at airports on reasonable suspicion of drug-trafficking substantially enhances the likelihood that police will be able to prevent the flow of narcotics into distribution channels." *Place,* 462 U.S. at 704, 103 S.Ct. at 2643. Thus, the Court wrote that

> the Government asks us to recognize the reasonableness under the Fourth Amendment of warrantless seizures of personal luggage from the custody of the owner on the basis of less than probable cause, for the purpose of pursuing a limited course investigation, short of opening the luggage, that would quickly confirm or dispel the authorities' suspicion. Specifically, we are asked to apply the principles of *Terry v. Ohio....* to permit such seizures on the basis of reasonable, articulable suspicion, premised on objective facts, that the luggage contains contraband or evidence of a crime. In our view, such application is appropriate.

*Place,* 462 U.S. at 702, 103 S.Ct. at 2642 (citation omitted).[1]

■ We find that the officers, upon seeing the items contained in Frost's pockets, had sufficient "reasonable suspicion" to detain Frost for further questioning, and submit his luggage and other belongings to a dog sniff test. We believe that Frost's appearance, belongings and behavior "were adequate grounds for suspecting [him] of carrying drugs and for temporarily detaining him and his luggage while [the officers] attempted to verify or dispel their suspicions in a manner that did not exceed the limits of an investigative detention." *Florida v. Royer,* 460 U.S. 491, 502, 103 S.Ct. 1319, 1327, 75 L.Ed.2d 229 (1983).

■ Frost argues that the 80 minutes that elapsed between the time Detective Adams brought the suitcase to the airport police station (5:40 p.m.) and the time the suitcase was offered to the dog for olfactory inspection (7:00 p.m.) was too long, and so exceeded the limits of lawful investigative detention.

Frost relies solely on *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), a case in which the Supreme Court found a search to be unreasonable and ordered the suppression of the evidence produced by the search.

In *Place,* law enforcement officers at Miami International Airport approached Mr. Place, whom they perceived to be acting suspiciously. Mr. Place gave them his identification and consented to a search of his luggage. Because Mr. Place's flight to New York City was about to depart, the officers chose not to search the luggage. Place boarded his flight and flew to New York. Before the flight had landed the Miami officers, who had detected some irregularities in Place's identification, notified the Drug Enforcement Agency (DEA). Two DEA agents were waiting for Place when his flight arrived in New York's La Guardia airport. When Place refused to consent to a search of his luggage, the agents seized it and told Place they were taking it to a federal judge to obtain a search warrant. The agents then took the luggage to Kennedy airport, where they submitted it to a dog sniff. Ninety minutes elapsed between the initial seizure of the luggage at La Guardia, and the sniff at Kennedy.

We quote the relevant passage of the opinion in *Place* at length:

> The length of the detention of respondent's luggage alone precludes the conclusion that the seizure was reasonable in the absence of probable cause. Although we have recognized the reasonableness of seizures longer than ... momentary ones ..., the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion. Moreover, in assessing the effect of the length of the detention, we take into account whether the police diligently pursue their investigation. We note that here the New York Agents knew the time of Place's scheduled arrival at La Guardia,

---

1. To demonstrate reasonable suspicion in support of an investigative stop, the officer must be able "to point to specific and articulable facts

which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880.

had ample time to arrange for their additional investigation at that location, and thereby could have minimized the intrusion on respondent's Fourth Amendment interests. Thus, although we decline to adopt any outside time limitation for a permissible *Terry* stop, we have never approved a seizure of the person for the prolonged 90–minute period involved here and cannot do so on the facts presented by this case. Although the 90–minute detention of respondent's luggage is sufficient to render the seizure unreasonable, the violation was exacerbated by the failure of the agents to accurately inform respondent of the place to which they were transporting his luggage, of the length of time he might be dispossessed, and of what arrangements would be made for return of the luggage if the investigation dispelled the suspicion. In short, we hold that the detention of respondent's luggage in this case went beyond the narrow authority possessed by police to detain briefly luggage reasonably suspected to contain narcotics.

*Place,* 462 U.S. at 709–10, 103 S.Ct. at 2645–46 (citations and footnotes omitted).

While this passage does emphasize the amount of time that elapsed between seizure and sniff, we conclude that the law as declared in *Place* does not support Frost's position. We do not read *Place* as placing a rigid time limit on the duration of investigatory seizures. Indeed, the Court expressly considered and rejected the approach of announcing a time limit:

"[w]e understand the desirability of providing law enforcement authorities with a clear rule to guide their conduct. Nevertheless, we question the wisdom of a rigid time limitation. Such a limit would undermine the equally important need to allow authorities to graduate their responses to the demands of any particular situation."

*Place,* 462 U.S. at 709, n. 10, 103 S.Ct. at 2646 n. 10.

We, like the Supreme Court, decline to abstract the duration of the seizure in *Place* from its circumstances. The seizure in *Place* lasted 90 minutes because of a lack of diligence on the part of the police to minimize the intrusion, a lack that was indicated not only in the failure to arrange for a dog sniffing team to be in place to greet Place upon his arrival at La Guardia, but also in the failure to communicate to Place where his luggage was being transported and how he might be able to get it back. The conduct of the officers in *Place* thus exhibited a general lack of concern for Place's enjoyment of his property.

We find no similar lack of concern in the case before us. The detectives called for a drug sniffing unit as soon as Mr. Frost made it clear that he would not consent to a search of the bag. It does not demonstrate a lack of diligence on the part of the detectives that a drug sniffing unit was not on duty that day, so that one had to be summoned to the airport. Nor is it unreasonable that the unit, being summoned at six o'clock in the evening, would take nearly an hour to reach the airport. Moreover, the detectives exhibited diligence in giving Frost receipts for the detained items and instructing him on how he could retrieve them. We find that none of the indicia of a lack of diligence, which substantially informed the result in *Place,* occurred in the instant case. We thus hold that the detention of Frost's suitcase constituted no violation of his rights.

### C.

Finally, Frost challenges the search on the ground that the affidavit submitted by the detectives petitioning for the search warrant was misleading. Specifically, Frost claims that the affidavit concealed the fact that the dog did not alert to the suitcase, and that it materially misstated the amount of marijuana that was involved in Frost's prior offense.

■ The rule governing situations involving allegedly misleading search warrant affidavits was articulated by the Supreme Court in *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). There the Court held that where the defendant proves by a preponderance of the evidence "that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and [that] the allegedly false statement is necessary to the finding of probable cause,

the Fourth Amendment requires that ... the fruits of the search [must be] excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Franks*, 438 U.S. at 155–56, 98 S.Ct. at 2676–77. Thus, in order to secure suppression of the fruits of the search, a defendant must show *both* that bad faith or reckless disregard existed on the part of the affiant, *and* that there would have been no probable cause but for the incorrect statement.[2]

### 1.

We first address the omission from the affidavit of the fact that the dog was exposed to, but did not alert to, the suitcase. Detective Adams, who prepared the affidavit in question, gave uncontroverted testimony that he omitted this fact from the affidavit because he did not feel that it was relevant to a probable cause determination. Adams explained that, in his experience, drug couriers often mask the scent of drugs by packaging the drugs in materials such as coffee or pepper or, as in this case, axle grease. Adams testified that he did not omit the fact of the "non-alert" in an attempt to distort the truth or mislead the magistrate; knowing what he knew, he simply viewed it as a neutral factor in the context of a probable cause determination.[3] He testified further that, if he had included the fact of the non-alert, he would have also explained the practice of "scent-masking" commonly employed by drug couriers. The district court ruled that Frost had not carried his burden under the second prong of *Franks*, and we agree. In *United States v. Calisto*, 838 F.2d 711 (3d Cir.1988), we explained that the second requirement of *Franks* provided:

"a vehicle for determining whether there was a causal connection between the alleged misrepresentation in that case and

the challenged search. If the information in the affidavit without the misrepresentation provided probable cause and the warrant should thus have been issued even had there been no scheme to deceive, there would be no causal connection between the scheme and the search and the search would not be tainted."

*Id.* at 715. We went on in *Calisto* to hold that where an omission, rather than a misrepresentation, is the basis for the challenge to the affidavit, a court should ask whether the affidavit would have provided probable cause if it had contained a disclosure of the omitted information.

Applying the teaching of *Calisto* to the facts of this case, we conclude that the relevant issue is whether the Adams affidavit would have provided probable cause if it had disclosed the information concerning the dog's sniffing of the suitcase, including the information about "scent masking" that Adams knew and would have included to enable the magistrate to evaluate the dog's failure to alert. Only an evaluation of the affidavit so supplemented will reveal whether there is a causal connection between Adams' failure to disclose and the search that could be found to taint the search.

When the relevant issue is thus framed, its resolution is not difficult. Adams' affidavit included the following information: Frost arrived from Ft. Lauderdale, a source city for drugs; Frost was not carrying luggage; Frost was young, acted furtively, and employed counter-surveillance techniques; Frost had large bulges in his front pockets and appeared to be carrying rolling papers in his back pocket; Frost became nervous when engaged in conversation by two detectives; Frost contradicted himself when speaking with the detectives; Frost was carrying a large amount of cash in small bills; there

---

**2.** *Franks* dealt only with misstatements, but we have applied the *Franks* test to situations where affiants have omitted information from the affidavit. *See United States v. Calisto*, 838 F.2d 711, 714–16 (3rd Cir.1988). *See also, e.g., United States v. Rumney*, 867 F.2d 714, 720 (1st Cir. 1989) ("[m]aterial omissions may also be the basis for a *Franks* hearing."), *cert. denied,* 491 U.S. 908, 109 S.Ct. 3194, 105 L.Ed.2d 702 (1989); *United States v. Williams*, 737 F.2d 594, 604 (7th Cir.1984) ("[w]e acknowledge that the rationale of *Franks* applies to omissions ..."),

*cert. denied* 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985); *United States v. Martin*, 615 F.2d 318, 328 (5th Cir.1980).

**3.** *See United States v. Calisto*, 838 F.2d at 715 (declining to hold that *Franks* allows a challenge to a warrant where omission "was occasioned not by a scheme to deceive the magistrate about a material fact, but by a desire to withhold a fact not material to the magistrate's task").

was a padlock on Frost's suitcase which he claimed to know nothing about; Frost had been arrested previously on a drug related charge; a drug sniffing dog alerted to the cash. This information clearly provided probable cause—that is, a "fair probability that contraband or evidence of a crime [would have been] found" in Frost's suitcase. *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983).[4] When one includes both the fact that the drug sniffing dog did not alert to the suitcase and the fact that drug couriers often mask the scent of drugs in suitcases so that a drug sniffing dog will not alert, the failure to alert to the suitcase is not inconsistent with the substantial probative thrust of information which Adams did include. Probable cause thus remains; suppression is not appropriate under the teachings of *Franks.*

### 2.

■ We consider finally Frost's challenge to the warrant because of the alleged misstatement of the amount of marijuana involved in his prior arrest. Here also, we find that Frost has failed to meet his burden under *Franks.*

The affidavit filed in support of the warrant provided the following information:

> "[y]our affiants called the Emmett Charter Twp. Police and spoke with Lt. Headley who stated that FROST had been arrested at his home in 1990 for possession of a large amount of marijuana. This was verified by county police radio room check of FROST using the information from his [Michigan] driver's license...." Appendix at p. 16.

Frost now asserts that the full information is not that he was arrested for possession of a

large amount of marijuana, but that he was convicted of a marijuana misdemeanor.

Initially, we note first that Frost has failed to demonstrate that a false statement was made. Being arrested for possession of a large amount of marijuana is not necessarily inconsistent with being convicted of a marijuana misdemeanor. Second, Frost tendered no evidence to the district court tending to show the sort of bad faith or reckless disregard for the truth on the part of the detectives that *Franks* requires. The record contains no evidence suggesting that Detective Adams or Detective Olearchick, who called the Emmett Charter Township Police in the course of running a background check on Frost, knew or had any reason to believe that the information supplied by the Emmett Charter Township Police was false. Finally, we conclude that probable cause would have existed if the affidavit had noted that Frost had been convicted of a marijuana misdemeanor instead of noting that Frost had been arrested for possession of a large quantity of marijuana.

### III.

We thus find no error in the District Court's order to deny Frost's motion to suppress, and we will affirm the judgment of sentence.

LOUIS H. POLLAK, District Judge, concurring.

I join the judgment of the court. I also join the court's opinion, subject to the following caveats with respect to Part II(C)(1):

### A.

I am troubled that Detective Adams, who prepared the affidavit submitted to a district

---

4. Frost, in his brief before this Court, suggests there was no probable cause because the fact that the dog alerted to the wad of cash means very little. Frost's brief cites to a footnote in a case from the Court of Appeals for the District of Columbia Circuit which surveys evidence indicating that drug sniffing dogs would alert to a high percentage of all cash in circulation. *See United States v. $639,558.00 in U.S. Currency,* 955 F.2d 712, 714 n. 2 (D.C.Cir.1992). We note that that case made no finding as to the percentage of cash that would alert a drug sniffing dog; the case concerned the "contemporaneous to arrest" requirement for warrantless searches, and the footnote in question is dicta. Moreover, neither

the evidence surveyed in that footnote nor similar evidence was presented for scrutiny and cross-examination at the suppression hearing. Nor was the argument that the dog's alert to the cash lacks probity for a probable cause determination presented to the district court. It is our practice that "[w]e generally refuse to consider issues that are raised for the first time on appeal." *Newark Morning Ledger Co. v. United States,* 539 F.2d 929, 932 (3rd Cir.1976). We thus do not reach the question of whether there would be probable cause if no weight could be attached to the fact that the dog alerted to the cash.

justice to support the application for a search warrant, included in the affidavit a recital that the sniffing dog alerted to Frost's roll of bills but omitted from that recital the fact that the dog did not alert to the suitcase Detectives Adams and Olearchick wanted permission to search. It may well be that Detective Adams had a good faith belief that the dog's failure to alert to the suitcase did not significantly cut against what he and Detective Olearchick felt to be "probable cause" to search the suitcase. But, as a trained law enforcement officer, Detective Adams must have realized that the district justice, whose responsibility it was to decide whether there was probable cause, might have found the dog's disinterest in the suitcase to be relevant to the probable cause issue, even if not dispositive. In this sense, the case at bar is unlike *United States v. Calisto,* 838 F.2d 711 (3d Cir.1988), cited by the court at footnote 3, *supra.* In *Calisto,* to be sure, this court emphasized that the omission from the affidavit "was occasioned not by a scheme to deceive the magistrate about a material fact, but by a desire to withhold a fact not material to the magistrate's task." *Id.* at 715. But in *Calisto* what Agent Gilbride omitted from the affidavit—with a view to protecting the identity of the confidential source—was the fact that there were three other law enforcement officers in the information chain between Agent Gilbride and the confidential source; the omission was not of a fact that might tend to cast doubt on the source's reliability. In the instant case, what Detective Adams decided not to tell the district justice was a fact that might be regarded by the district justice as militating against the weight of the other information, contained in the affidavit, which tended to show that Frost might indeed be a drug courier.

Notwithstanding my misgivings about Detective Adams' failure to make full disclosure, I agree with the court that, had the omitted information been included in the affidavit, the district justice would nonetheless have justifiably found probable cause and issued the search warrant. Accordingly, although I do not condone Detective Adams' coyness, I think no harm of constitutional magnitude was done.

## B.

The court points out, in footnote 4, that Frost in his brief on appeal has challenged the finding of probable cause on an additional ground—namely, that American currency is pervasively contaminated with grains of cocaine, with the result that a dog's alert to currency is not indicative that the possessor of the currency is in possession of cocaine. The court notes, however, that Frost did not present this contention to the district court and, therefore, should not be permitted to present it here. I agree. I would only add that the contention, had it been timely made, would not appear to be on its face a frivolous one. In addition to the District of Columbia Circuit's reference to the problem in *United States v. $639,558.00 in U.S. Currency,* 955 F.2d 712, 714 n. 2 (D.C.Cir.1992) (relied on by Frost and cited by the court in footnote 4) see the Sixth Circuit's comparable reference in *United States v. $53,082.00 in U.S. Currency,* 985 F.2d 245, 250–51 n. 5 (6th Cir. 1993). See also Arthur S. Hayes, *Cocaine–Tainted Cash Faulted As Evidence, Wall Street Journal,* June 2, 1993, p. B–5. Whether concerns about the reliability of a sniffing dog's alert to currency are soundly based can only be tested by an evidentiary hearing of a sort that Frost did not ask the district court to conduct.