UNITED STATES of America

v.

Jose ORTIZ, a/k/a Raoul Ramos.

Crim. No. 93–396.

United States District Court,
E.D. Pennsylvania.

Oct. 26, 1993.

Memorandum Denying Reconsideration
Nov. 8, 1993.

James J. Eisenhower, Asst. U.S. Atty., U.S. Atty's. Office, Philadelphia, PA, for U.S.

Guy R. Sciolla, Philadelphia, PA, for Ortiz.

## MEMORANDUM

DALZELL, District Judge.

On July 13, 1993, defendant Jose Ortiz was disembarking Delta flight 904 at the Philadelphia International Airport when three airport police officers stopped him, frisked and handcuffed him, and took him to the police station at the airport. At the station, they ultimately found fourteen kilograms of cocaine in his carry-on bag. The Government charged Ortiz with possession with intent to distribute in excess of five kilograms of cocaine, in violation of 21 U.S.C. § 841(a)(1).

Ortiz has filed a motion to suppress the drugs and other physical evidence seized from him that day, contending that the seizure violated his rights under the Fourth Amendment of the United States Constitution. We received two rounds of briefing and then held a hearing on the motion on October 21, 1993. After careful consideration of the briefs as well as the testimony and arguments at the hearing, we will grant Ortiz's motion based upon the following Fed. R.Crim.P. 12(e) findings of fact and legal analysis.

1. The informant did not mention to Officer King how much cash was involved. At the hearing we received the ticket in evidence as Government Exhibit 3, which showed that the ticket price was $443.00.

2. By this time, Ramos's plane was scheduled to arrive in Philadelphia in thirty minutes.

### Factual Background

On July 19, 1993, David King, a drug interdiction officer in the San Diego Port District Police Department, received a telephone tip from an unidentified airline employee who stated that a man named Raoul Ramos would be arriving in Philadelphia at 3:24 p.m. on a Delta Airlines flight from Atlanta, sitting in seat 38C. The flight originated in San Juan, Puerto Rico. Moreover, the informant, who was not from San Juan, reported that he or she had learned from a centralized computer system that Ramos had purchased the one-way ticket in cash [1] on the day of the flight, had not checked any bags and had not given a "callback number" to the purchasing agent.

King, believing this information raised suspicion that Ramos was a drug courier, telephoned the Philadelphia Police Department. The Police Department eventually connected him with Philadelphia Police Detective Peter Kosmalski, who is assigned to duty at the Philadelphia airport. King relayed all of the informant's information to Kosmalski.[2] He also informed Kosmalski that there was a drug organization based in Puerto Rico that had been transporting drugs from San Juan to cities on the Eastern seaboard. King advised Kosmalski that there had been several arrests recently at New York City airports, and stated that the couriers might well be diverting their operations to Philadelphia and other cities away from New York. He also told Kosmalski, who had no experience with airport drug interdiction, that couriers often carry their contraband in body packs.[3]

Upon receiving the call from King, Detective Kosmalski called the Delta manager and asked that a stewardess point out the passenger in seat 38C as he exited Delta flight 904. Kosmalski also telephoned for a patrol car to meet him at the gate in order to drive Ramos to the police station at the airport.

3. Although King testified otherwise, Kosmalski testified at the suppression hearing that King had told him that Raoul Ramos was "part of an organization", and that "[t]hey were generally delivering drugs from San Juan through Atlanta to New York, but they had been arrested lately in New York and they had changed their itinerary to now arrive in Philadelphia."

Kosmalski then proceeded to the gate in Terminal E to meet Ramos's plane. An officer drove a patrol car on the tarmac to the stairs from the jetway, and then joined Kosmalski. Another officer met Kosmalski at the gate. All three of the officers were armed, at least two of them with visible sidearms.

As the exiting passengers walked through the jetway, a stewardess pointed to a man dressed in a white shirt and black pants who was carrying two small duffel bags, indicating that he was the man Kosmalski sought. Kosmalski and his colleagues approached the man in the jetway. Kosmalski flashed his badge and asked the man if he was Raoul Ramos. The man answered "yes". Kosmalski then told Ramos that he was "under investigation", set Ramos's bags aside and asked him to put his hands up on the jetway wall. According to Kosmalski, Ramos appeared "surprised" but did as Kosmalski directed, never in any way resisting. Kosmalski's patdown revealed neither weapons nor contraband on Ramos's body. Kosmalski then handcuffed Ramos's hands behind his back, and took him down the flight of stairs from the jetway to the tarmac where the patrol car was waiting. The three officers drove Ramos the short distance from Terminal E to an entrance to the police station between Terminals C and D for questioning.

When they arrived at the station, Kosmalski removed the handcuffs.[4] Ramos then admitted to the officers that his real name was Jose Ortiz and reported that he lived on Mutter Street in Philadelphia. Kosmalski ran a security check using this information, and found that there were three open warrants for Ortiz's arrest, all for drug-related offenses. Kosmalski then said he placed Ortiz under arrest and telephoned for a dog handler to bring a drug sniffing dog to the station.

When the dog, Ben, arrived and smelled Ortiz's bags, he reacted strongly to a black carry-on travel bag. Ben seized the bag in his teeth and shook it violently, causing one of the zippers to open part way. The dog

handler could then see through the six inch aperture that the bag contained white, brick-shaped objects wrapped in pink cellophane. Kosmalski opened the bag and found fourteen kilo-size bricks, with the word "LOBO" written on each of them.

### Legal Analysis

We agree with both parties that the focus of our inquiry should be on what took place at the Delta Airlines jetway and earlier. The Government has conceded that "Detective Kosmalski clearly did not have probable cause to arrest Ortiz at the plane," but argues that "he did have sufficient information for an investigatory stop." Government's Response to the Defendant's Motion to Suppress Evidence ("Government's Response") at 4. The Government contends that this "investigatory stop" satisfied the standards the Supreme Court set for airport interdictions in *United States v. Sokolow*, 490 U.S. 1, 9, 109 S.Ct. 1581, 1586-7, 104 L.Ed.2d 1 (1989).

By the time of oral argument at the conclusion of the suppression hearing, however, the Government's position was further refined, and may be summarized as contending that (1) the handcuffing in the jetway was a permissible "investigatory stop" under *Sokolow*, but that, if we believe otherwise, (2) to the extent we believe there was not sufficient "reasonable suspicion" to make the "investigatory stop", that gap was filled by Detective Kosmalski's good faith belief that he did have sufficient reason to make the "stop". The Government further argues that the handcuffing in the jetway constituted an "investigatory stop" and not an "arrest".

Both parties have proffered no decisions from either the Supreme Court or our Court of Appeals that address the issue of a "good faith" exception to the rule of *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968), that an officer must have "a reasonable suspicion" that the defendant had engaged in criminal activity before stopping him. Given the novelty of this question in this Circuit, as well as the obvious impor-

---

4. From the time Detective Kosmalski handcuffed Ramos to the time he removed them at the sta-

tion, approximately six to eight minutes elapsed.

tance of the question given the seizure of fourteen kilograms of cocaine, we will analyze the Government's contentions in some detail, beginning with its argument that no arrest took place in the jetway.

(a) *Did the handcuffing in the jetway constitute an "arrest"?*

■ The Supreme Court in *United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985), analyzed at length its prior precedents to elucidate the "difficult line-drawing problems in distinguishing an investigative stop from a de facto arrest." 470 U.S. at 685, 105 S.Ct. at 1575. While admitting that it would be desirable for law enforcement officers to be given a "bright line" to help make this distinction, the Court held that "Much as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and other human experience must govern over rigid criteria." *Id.*

In *Sharpe*, a twenty minute stop of a vehicle was held not to constitute an arrest. Notably, no one was handcuffed in *Sharpe*, but the detention was manifestly necessary given the evasive action the vehicles in question took when the police were following them, as well as the fact that the officers believed one of the vehicles to be carrying contraband. Indeed, the Government has not called our attention to any Supreme Court decision, or any from this Circuit, where a handcuffing was held to constitute an "investigative stop."

The Government's citations to Court of Appeals' decisions from other Circuits do not support its contention that the handcuffing of Ortiz constituted, using "common sense and ordinary human experience", an investigative stop. For example, in *Tom v. Voida*, 963 F.2d 952, 958 (7th Cir.1992), the detainee attempted to escape and therefore was handcuffed. The Court held this to be a "measured use of force ... [which] was appropriate to accomplish the purposes of an investigatory stop." *Id.* By contrast, the Government here does not contend, nor did any witness, that Ortiz made the slightest move suggesting an escape.

The Government also cites *United States v. Jones*, 759 F.2d 633, 639 (8th Cir.1985), as establishing circumstances that justify the use of handcuffing during an investigatory stop:

[t]he number of officers and police cars involved, the nature of the crime and whether there is reason to believe the suspect might be armed, the strength of the officers' articulable, objective suspicions, the erratic behavior of or suspicious movements by the persons under observation, and the need for immediate action ... and lack of opportunity for them to have made the stop in less threatening circumstances.

Again, none of these circumstances obtained in Ortiz's case.

The only case the Government cites from this Circuit at all analogous to the present case is *United States v. Frost*, 999 F.2d 737 (3d Cir.1993). *Frost*, however, stands in contrast to what occurred here.

David Lauren Frost disembarked from a Ft. Lauderdale, Florida flight to Greater Pittsburgh International Airport. At about 5:00 p.m., interdiction officers noticed bulges in the pockets of Frost's jeans, and that Frost carried no luggage, and followed Frost as he entered and exited a restroom in fifteen seconds. After following him for about twenty minutes, and observing Frost's "attempt to conceal something on his person", the officers approached Frost, and after identifying themselves asked, "Is it okay if we talk with you for a few minutes?" Frost agreed, and after seven minutes' questioning, was asked "if it would be okay with him, if he could show us what was in his pockets". Frost produced rolls of ten and twenty dollar bills from each pocket, totalling $3,035, and a sky pager (which he turned off, thereby erasing the telephone numbers recorded). The detectives asked Frost to accompany them to the airport police station, to which Frost consented. Another officer obtained Frost's suitcase at approximately 5:40 p.m. The suitcase was padlocked. Fifteen minutes later, Frost refused a request to search his suitcase, and at 6:55 left the station with receipts for his cash, luggage and pager, and boarded a flight to Lansing, Michigan. The delayed dog sniff minutes later resulted in

the dog's "alert" to Frost's cash, but not to the suitcase. Based on the dog's alert, a district justice issued a search warrant at 7:55 p.m. and the suitcase was opened to reveal ten one-kilogram packages of cocaine. Frost was then arrested on the plane still waiting at the gate.

It will be noted that at no time before his arrest was Frost physically restrained, much less handcuffed. The Court of Appeals therefore unsurprisingly affirmed the denial of Frost's motion to suppress.[5]

By contrast, Ortiz was handcuffed immediately after his patdown, and in the presence of three armed police officers. Ben's Pavlovian reaction to the carry-on luggage occurred long after the handcuffing. "Common sense and ordinary human experience", especially as educated with reference to *Frost*, can only describe this jetway handcuffing by three armed police officers as an "arrest".

The Government cites a Philadelphia Police Department Directive 34, dated July 16, 1982, as authority for Detective Kosmalski's handcuffing of Ortiz, even though Ortiz was only a "suspect". Paragraph III.D is cited as the justification for Detective Kosmalski's handcuffing. This part of the Directive provides, in full:

> Prisoners being transported between police facilities, e.g., Police District to Detention Unit, shall be handcuffed. Handcuffs shall be removed upon arrival to facilitate searching and normal prisoner processing.

The "common sense and ordinary human experience" understanding of the word *prisoner* is "1: a person held under restraint: as a: a person held under arrest or in prison", *Webster's Third New International Dictionary* 1804 (1986); "1.a one who is kept in prison or in custody, *spec.* one who is in custody as the result of legal process, either as having been condemned to imprisonment, or as waiting trial for some offense", XII *The Oxford English Dictionary* 513 (2d. ed. 1989). The only time the Directive permits handcuffing of "[p]ersons suspected of committing a crime" is when they "are returned to the scene for identification". Directive 34, ¶ III.E.[6] It is undisputed that Ortiz was not being returned to the scene for identification.

If, therefore, we are to take as authority the Philadelphia Police Department Directive the Government has proffered to us, Detective Kosmalski and his two colleagues necessarily regarded Ortiz as a "prisoner". They therefore saw Ortiz as we do, one who has been arrested, "awaiting trial for some offense."

We therefore hold that the immediate handcuffing of Ortiz constituted an arrest. Since the Government has conceded it was made without probable cause, it was an unlawful one. The fruits of that unlawful arrest must, under the law, be suppressed.[7] *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

(b) *If the handcuffing in the jetway is regarded as an "investigatory stop", was there "reasonable suspicion" to make it?*

■ As noted earlier, the Government has cited *United States v. Sokolow, supra*, as authority justifying what it claims was the "investigatory stop" in the jetway. A review of *Sokolow*, however, demonstrates how far short Detective Kosmalski was in having permissible "objective justification" for making his stop. *Immigration & Naturalization Service v. Delgato*, 466 U.S. 210, 217, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984).

When Drug Enforcement Administration agents stopped Andrew Sokolow upon his

---

5. Though not condoning one officer's "coyness" in failing to note to the district justice that the dog alerted to the cash but not the suitcase, 999 F.2d at 745, Judge Pollak concurred because probable cause existed to issue the search warrant despite this omission.

6. "Persons suspected of committing a crime who are returned to the scene for identification shall be handcuffed. However, when the individual is not identified as the perpetrator and no other charges are placed, he/she shall not be handcuffed while being returned to where they were originally stopped for investigation."

7. Ironically enough, Officer King, the source of all of Detective Kosmalski's information, and the Government's proffered maven on airport interdiction, admitted that, if he had been the interdicting officer in the jetway, he would not have handcuffed Ortiz.

arrival at Honolulu International Airport and found 1,063 grams of cocaine in his carry-on luggage, they know this about him:

> (1) he paid $2,100 for two airplane tickets from a roll of $20 bills; (2) he traveled under a name that did not match the name under which his telephone number was listed; (3) his original destination was Miami, a source city for illicit drugs; (4) he stayed in Miami for only 48 hours, even though a round-trip flight from Honolulu to Miami takes 20 hours; (5) he appeared nervous during his trip; and (6) he checked none of his luggage.

*Sokolow, supra,* 490 U.S. at 4, 109 S.Ct. at 1583.

The Court reaffirmed its standard for evaluating "reasonable suspicion", which calls upon us to consider the "totality of the circumstances—the whole picture". *Id.* at 8, 109 U.S. at 1585 (quoting *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)). Echoing the "common sense and ordinary human experience" standard of *Sharpe,* the Court in *Sokolow* also cited with approval *Cortez's* explanation of how courts should apply this standard:

> "The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers."

*Id.,* 490 U.S. at 8, 109 S.Ct. at 1583–1584 (quoting *Cortez, supra,* 449 U.S. at 418, 101 S.Ct. at 695). Against this standard, the Court found the six indicia of suspicion "taken together … [to] amount to reasonable suspicion." *Sokolow,* 490 U.S. at 9, 109 S.Ct. at 1586.

Contrary to the Government's contention, *Sokolow* does not stand for the proposition that any "matching of drug courier profiles has been held sufficient to legitimate such stops." Government's Response at 4. Our rejection of the Government's expansive reading of *Sokolow* is confirmed by the Eighth Circuit's application of *Sokolow* in *United States v. Millan,* 912 F.2d 1014 (8th Cir.1990).

The Eighth Circuit held the "totality of the circumstances" known to the stopping officer *not* to "supply the requisite level of suspicion to justify the intrusion into Millan's fourth amendment rights" when this officer knew

> that Millan (1) arrived on an early morning flight from San Francisco, (2) was one of the first passengers to deplane, (3) carried a garment bag and no checked luggage, dressed casually, wore a gold chain around his neck and had long hair, (4) walked rapidly through the airport without distraction, (5) purchased his one-way ticket with cash the day before the flight, (6) was not traveling under an assumed name, (7) said he had been visiting his cousin but could not remember his cousin's address or telephone number, and (8) had something evenly-shaped in the inner pockets of his leather bomber jacket.

*Id.* at 1017. Noting that these circumstances "describe a very large category of presumably innocent travelers", the Court reversed the District Court's denial of Millan's motion to suppress. *Id.* (quoting *Reid v. Georgia,* 448 U.S. 438, 441, 100 S.Ct. 2752, 2757, 65 L.Ed.2d 890 (1980) (*per curiam*)).

Our conclusion that the indicia of suspicion of *Ortiz* falls short under *Sokolow* and *Millan,* applying the "common-sense conclusions about human behavior" that *Cortez* commands us to make, is also confirmed with reference to the testimony of Officer King, the source of Detective Kosmalski's information, and the Government's proffered airport interdiction maven. King confirmed that he used Defendant's Exhibit One as a "handy publication" in making airport interdictions, and that this summary is given to new officers in the drug interdiction unit at San Diego Airport. Citing *Sokolow,* these "Guiding Principles" list eleven "Profile Characteristics":

1. Traveling with little or no luggage.

2. Purchasing tickets with small-denominations.

3. Traveling to or from a major import center.

4. Traveling under an alias.

5. Scheduling rapid turnaround time for a lenghty [*sic*] airplane trip.

6. Carrying unusually large amounts of currency .. [*sic*]

7. Displaying nervousness beyond that ordinarily exhibited by travelers.

8. Using public transportation (especially taxicabs) almost exclusively after arriving on a flight.

9. Making a phone call almost immediately after deplaning.

10. Leaving a fictitious callback telephone number with the airline.

11. Traveling frequently to or from identified drug distribution cities.

At the time Detective Kosmalski handcuffed Ortiz, the only "profile" match known to him for certain was that Ortiz satisfied the second and third characteristics.[8] The facts available to Detective Kosmalski, as Officer King relayed them to him, simply would not "warrant a man of reasonable caution in the belief" that there was "reasonable suspicion" to stop—much less arrest—Ortiz.

Thus, even regarded as an investigative stop, the jetway handcuffing was an unreasonable seizure, and therefore an unlawful one under the Fourth Amendment.

(c) *Is Detective Kosmalski's "stop" or "arrest" absolved because of "good faith"?*

█ Doubtless in recognition of the imperfections of the seizure of Ortiz in the jetway, the Government's fallback position is that we should transmute an unreasonable seizure into a reasonable one because Detective Kosmalski acted in "good faith". The Government thus invites us to carve out a "good faith" exception to *Terry v. Ohio, supra,* which we decline to do because (1) no such exception exists and (2) even if it did, it would not apply because Detective Kosmal-

ski's belief was "not objectively understandable and reasonable".[9]

(1) *To make a "good faith" exception to Terry would be to introduce an unreviewable subjectivity the Supreme Court has never permitted in its Fourth Amendment cases.*

Citing *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), and *United States v. De Leon–Reyna,* 930 F.2d 396 (5th Cir.1991) (*en banc*), the Government argues that the shortcomings in Detective Kosmalski's jetway handcuffing should be of no constitutional significance because he acted in "good faith". The Government acknowledges that neither the Supreme Court nor the Third Circuit have accepted this expansion of *Leon* from the search warrant to the "stop and frisk" context. We do not believe that either Court will follow the divided *en banc* court in *De Leon.*[10]

A *leitmotif* in the Supreme Court's Fourth Amendment jurisprudence is that reasonableness necessarily means withstanding objective, and not subjective, scrutiny. Thus, the linchpin of the Court's holding in *Leon*— that officers were entitled to rely on the facial validity of a search warrant—was the firmly established principle that:

Because a search warrant "provides the detached scrutiny of a neutral magistrate, which is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer 'engaged in the often competitive enterprise of ferreting out crime,'" *United States v. Chadwick,* 433 U.S. 1, 9, 97 S.Ct. 2476, 2482, 53 L.Ed.2d 538 (1977) (quoting *Johnson v. United States,* 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948)), we have expressed a strong preference for warrants and declared that "in a doubtful or

---

8. Ortiz did not satisfy the tenth characteristic because rather than leaving a fictitious callback number, he left no number at all, a not unsurprising fact given that he was imminently about to board a plane home. With respect the second characteristic ("[p]urchasing tickets with small-denominations"), Kosmalski had no information as to the type of bills that Ortiz used to purchase his ticket, or even the amount Ortiz paid for the ticket.

9. A locution we borrow from *Maryland v. Garrison,* 480 U.S. 79, 88, 107 S.Ct. 1013, 1019, 94 L.Ed.2d 72 (1987).

10. Or, the Government has advised us after the suppression hearing, the Tenth Circuit in *United States v. Walraven,* 892 F.2d 972, 975 (10th Cir. 1989).

marginal case a search under a warrant may be sustainable where without one it would fall." *United States v. Ventresca*, 380 U.S. 102, 106, 85 S.Ct. 741, 744, 13 L.Ed.2d 684 (1965).

*Leon, supra*, 468 U.S. at 919–914, 104 S.Ct. at 3416. When "the detached scrutiny" of a magistrate is not available, the Court has looked to whether the searching or seizing officers are objectively reasonable and their actions based upon "objective facts available to the officers at the time". *Illinois v. Rodriguez*, 497 U.S. 177, 185, 110 S.Ct. 2793, 2799, 111 L.Ed.2d 148 (1990) (quoting *Maryland v. Garrison, supra*, 480 U.S. at 88, 107 S.Ct. at 1019).

■ A court can review whether a search warrant was issued in the ordinary course by a "detached magistrate." *See United States v. Leon, supra.* Though a warrant may be overbroad in its description of the site to be searched, a reviewing court may read its plain language and absolve the officers who follow it to the letter. *See Maryland v. Garrison, supra.* If consent to search, though given by one without authority under state law, is by all accounts given by one with factually apparent authority, the reviewing court proceeds from an admitted fact in finding a reasonable belief that a valid consent to search was given. *See Illinois v. Rodriguez, supra.*

Here, however, the Government invites us to plumb Detective Kosmalski's mind—the ultimate subjective enterprise. It admits that he misheard what Officer King told him because Officer King never said the passenger in Delta flight 904's seat 38C "was part of an organization ... generally delivering drugs...." The Government argues that Detective Kosmalski made an honest mistake, and that Philadelphia should not pay for that mistake by freeing a courier importing fourteen kilograms of cocaine into the City.[11]

If we were to accept the Government's argument, what is there for us to review? Detective Kosmalski, in effect, tells us he misheard Officer King. How can we test this statement, or statements like it that would unquestionably witness exponential growth if we accept the Government's view?

It should be noted that the Government's position here is more expansive that what the Eighth Circuit accepted in *De Leon.* At least in that case there was no apparent dispute that a radio dispatcher, not the officer, "misunderstood" what the officer said to her. 930 F.2d at 398. Thus, even the Eighth Circuit did not have to delve into the officer's mind.[12]

If we regarded *De Leon* or *Walraven* as persuasive, we would still have to take one more step in the direction of subjectivity to hold for the Government. If Detective Kosmalski heard Officer King *right,* then this case would be congruent with *De Leon* and *Walraven.* But on the Government's view of the evidence Detective Kosmalski heard Officer King *wrong.* Officer King never said that this "Raoul Ramos" "was part of an organization ... generally delivering drugs...." Even on the Eighth or Tenth Circuit's view of the law, Detective Kosmalski's belief cannot be regarded as "objectively reasonable" because at best it was based on his free-floating mental belief and not on any verifiable reality outside his mind.

But it seems to us that the length of the voyage we have taken on this issue confirms why we should never have left the dock. If courts abandon the *terra firma* of warrants and "objectively reasonable" consents, they will necessarily find themselves at sea without an identifiable rudder. This is why, as Justice Scalia noted for the Court in *Illinois v. Rodriguez, supra,* Fourth Amendment reasonableness must be rooted in objective reality. This is why, therefore, there cannot be a subjective "good faith" exception to

---

**11.** At oral argument, the Government heaped the usual ashes upon the exclusionary rule. While reasonable minds can disagree about the rule—indeed, America is alone in the legal world maintaining it—we are aware of no hints from the Supreme Court suggesting the imminent demise of *Mapp* and *Wong Sun.*

**12.** *United States v. Walraven, supra* note 10, is to the same effect, also involving a dispatcher's error. Thus, the Tenth Circuit, too, did not embark upon the ultimate subjective voyage the Government has invited us to take here.

*Terry's* requirement of "reasonable suspicion" from the officer.

(2) *In any event, Detective Kosmalski's belief was not "objectively understandable and reasonable."*

As noted in the previous section, even if we were to accept the Eighth and Tenth Circuit decisions in *De Leon* and *Walraven,* we would still have to find that Detective Kosmalski's understanding of what Officer King said was "objectively reasonable". This we cannot do.

Officer King testified that he related to Detective Kosmalski the following information about "Ramos": he paid cash for his ticket, checked no luggage, and gave no call-back number to the agent when he brought his ticket at the airport. Officer King also informed Detective Kosmalski that Ramos was sitting in seat 38C on Delta flight 904, and that the flight had originated in San Juan, Puerto Rico, a "source city" for cocaine. Officer King testified that he also explained his personal experience with airport interdiction. He mentioned that a San Juan-based group was using airports other than New York City's to import drugs, using Hartford, Connecticut and Philadelphia, Pennsylvania, as examples. He said that drug couriers conceal drugs on their bodies.

Since the Government puts such stress on it, we now reproduce in full Detective Kosmalski's testimony about what he recalled Officer King saying him: [13]

Q. What did he tell you about Mr. Ramos, what was the purpose of the phone call?

A. He told me he was a fellow of Puerto Rican descent. That he was travelling from San Juan through Atlanta into Philadelphia. That he was part of an organization, that he was from New York. They were generally delivering drugs from San Juan through Atlanta to New York, but they had been arrested lately in New York and they had changed their itinerary to now arrive in Philadelphia.

Q. Did he tell you anything about the way in which this individual may be carrying drugs?

A. Yes.

Q. What was that?

A. He told me that they would often carry the illegal drugs in body bags.

Q. Did he explain what that was?

A. I was familiar with the term.

Q. What do you take that to mean or what did you take it to mean at that time?

A. That the drugs would be secreted under their clothing in packages.

Q. Did he tell you anything about the way in which Mr. Ramos had purchased his ticket?

A. He told me that the ticket was purchased with cash.

Q. Did he tell you anything about how much time prior to the flight the ticket was purchased? In other words, was it purchased weeks in advance or that day?

A. I believe he told me it was purchased that day, shortly before the flight.

It will be noted that, taken literally, Detective Kosmalski did not report that Ramos *was* delivering drugs on this flight, but that "an organization" was "*generally* delivering drugs from San Juan through Atlanta to New York...." Put another way, even on Detective Kosmalski's proffered understanding, Officer King did not say by words or circumlocution that "this guy is carrying drugs on this flight."

Both witnesses agree that Officer King said "that they would often carry the illegal drugs in body bags.", that is to say, that "the drugs would be secreted under their clothing in packages." But Detective Kosmalski testified that when he patted down Ramos/Ortiz, he found *no* "body bags" or anything else "secreted under [Ramos's] clothing in packages." To the contrary, Ramos/Ortiz, like

---

**13.** This testimony appears at pages 62–63 of the preliminary draft transcript available to us at this time.

most contemporary air travellers, walked on the jetway holding carry-on luggage in each hand.

It is therefore clear that, on Detective Kosmalski's account of it, the reality he obtained for himself through the patdown and personal observation did not confirm what Detective Kosmalski said Officer King had led him to expect. His handcuffing of Ramos/Ortiz under these circumstances, even on this most charitable reading of the record, was no longer "objectively reasonable", *Maryland v. Garrison, supra,* 480 U.S. at 88, 107 S.Ct. at 1019, cited with approval in *Illinois v. Rodriguez, supra,* 497 U.S. at 90, 110 S.Ct. at 2799 and in *De Leon, supra,* 930 F.2d at 399.

Viewed less charitably, we agree with defense counsel's point that what we are presented with here is a credibility contest between Officer King and Detective Kosmalski. Based upon what we saw and heard at the hearing, this contest is not close, and we find Officer King's testimony to be entirely credible and therefore accept it.[14]

*Conclusion*

We conclude that, even under the most elastic reading of the Fourth Amendment, Detective Kosmalski's jetway handcuffing of Ortiz was unlawful, and therefore the fruits of that action must, under *Mapp* and *Wong Sun,* be suppressed. An appropriate Order follows.

*ORDER*

AND NOW, this 26th day of October, 1993, upon consideration of defendant's motion to suppress, the briefs of the parties, and after a hearing at which evidence was adduced and oral arguments heard, and for the reasons

set forth in the foregoing Memorandum, it is hereby ORDERED that:

1. Defendant's motion is GRANTED;

2. The physical evidence seized from the defendant after his jetway handcuffing (luggage bag, airline ticket and boarding passes, and fourteen kilogram bricks of cocaine) shall be excluded from evidence in the trial of this matter; and

3. A hearing on the defendant's detention pending appeal by the Government, pursuant to 18 U.S.C. § 3143(c), shall be held at 2:30 p.m. on October 28, 1993 in Courtroom 5C.

*MEMORANDUM ON RECONSIDERATION*

The Government has filed a motion to reconsider our ruling of October 26, 1993 in which we suppressed evidence seized from the defendant after what we held to have been an unlawful arrest, or, alternatively, an "investigatory stop." The essence of the Government's reconsideration motion is that a second "arrest" took place of this defendant after it was learned that his real name was Jose Ortiz and not "Raoul Ramos" and that there were three extant arrest warrants outstanding for Jose Ortiz. As a result, the Government contends that the evidence seized could not have been the unlawful "fruit" of the tree that was tainted by the jetway arrest of the defendant within the meaning of *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963).

For reasons we will now set forth, we reject the Government's twelfth hour contentions as being incompatible with well-established principles of Fourth Amendment jurisprudence.[1]

14. Notwithstanding the Government's attempt to make airport drug interdiction a branch of law enforcement quantum mechanics to which Detective Kosmalski was uninitiated, we find nothing so esoteric in what happened in the jetway. Detective Kosmalski was at the time of the handcuffing a twenty-two year veteran of the Philadelphia Police Department. He testified that he had personal experience with at least a hundred drug cases as a police officer. Questions of stops and arrests occur every day in the lives of urban police officers. We therefore decline the Government's invitation to find Detective Kosmalski a

*naif*—and therefore entitled to our constitutional solicitude—in the world of Fourth Amendment seizures.

1. It is worth noting here that the Government was afforded two opportunities to brief the issues raised in the motion to suppress, and was also afforded an hour of oral argument after the evidence was adduced on October 21. At no time in either its two briefs or in its oral argument did the Government hint at the argument now made in thirteen pages of post-decision briefing. It simply will not do for the Government to fail to

The Government proffers as the theoretical basis of its argument views that the Government originally attributed to the late Judge Friendly, but after our query now concedes are those of a student commentator in the *University of Pennsylvania Law Review*:

> The purpose of depriving the government of any gain is to remove any incentive which exists toward the unlawful practice. The focus is forward—to prevent future violations, not punish past ones. Consequently, where the chain between the challenged evidence and the primary illegality is long or the linkage can be shown only by "sophisticated argument", exclusion would seem inappropriate. In such a case it is highly unlikely that the police officers foresaw the challenged evidence as a probable product of their illegality; thus it could not have been a motivating force behind it. Absent this, exclusion carries with it no benefit to society and should not prejudice society's case against a criminal.

*Comment,* 115 U.Pa.L.Rev. 1136, 1148–49 (1967), referencing Justice Frankfurter's statement in *Nardone v. United States,* 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939), that "sophisticated argument may prove a causal connection" that in reality "may have become so attenuated as to dissipate the taint."[2] Taking this as an accurate summary (whatever its parentage) of the policies animating the exclusionary rule, we find as a fact that the obtaining of the physical evidence from this defendant was necessarily linked to what we held to be the unlawful jetway handcuffing of Ortiz.

■ The first confirmation that the unlawful jetway seizure had not "become so attenuated as to dissipate the taint" is that Ortiz's admission about his real name occurred no more than six to eight minutes after the handcuffing.[3] Between the handcuffing and the admission, no exogenous, lawful event happened to break the flow of action that began with the jetway handcuffing[4]. *All* of the additional information obtained after Ramos/Ortiz was seized rapidly and without interruption followed from the fact that he was in (unlawful) custody.[5]

■ The Government contends, however, that the questions Detective Kosmalski asked at the police station were "routine booking questions" and were, therefore, exempt within the "routine booking exception" it says exists to *Miranda.* See Government's Motion to Reconsider at 10, n. 6, citing *Pennsylvania v. Muniz,* 496 U.S. 582, 601, 110 S.Ct.

raise all of its arguments before decisions are made on dispositive motions in cases where, as here, trial is imminent. Since the motion for reconsideration bears the signature of the Chief of the Narcotics Section of the United States Attorney's Office (as well as that of the Assistant United States Attorney assigned to the case), we conclude that this stratagem has the imprimatur of senior authority in the United States Attorney's Office.

2. Though *Nardone* was decided a generation earlier than *Mapp,* the exclusionary rule had been applied in federal prosecutions since *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914).

3. See note 4 at p. 826 of our October 26 Memorandum.

4. The two state court decisions attached to the Government's motion are not to the contrary of this point, but confirm it. In *State v. Tyrrell,* 234 Neb. 901, 453 N.W.2d 104 (1990), a photograph was taken of the defendant during an illegal arrest on October 26, 1987. The same photograph was used on November 11 of the same year, and the victim identified the defendant in that photograph. The Nebraska Supreme Court understandably rejected the argument "that all such pictures resulting from illegal arrests are inadmissible forever", 453 N.W.2d at 109. Sixteen days separated the taint from the fruit in *Tyrrell;* eight minutes did here. To the same effect is *State v. Phillips,* 140 Vt. 210, 436 A.2d 746 (1981), where a second police officer, based upon "information totally independent of the defendant or her [illegal] detention" by a first officer, arrived on a scene and properly arrested the defendant. There was no overlap of facts motivating the second officer other than the fact that the first officer, who was on another investigation, happened to have detained the defendant. Rather than two officers independently investigating two incidents, here one officer acted on the same investigation.

5. The Supreme Court has held that "temporal proximity" is a relevant factor in determining taint. *Brown v. Illinois,* 422 U.S. 590, 603, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975) (two hours between illegal arrest and initial incriminating statement, without any "intervening event of significance", *held* tainted).

2638, 2650, 110 L.Ed.2d 528 (1990). The Government, however, miscites *Muniz.*

In this portion in his opinion for himself and Justices O'Connor, Scalia and Kennedy, Justice Brennan was referring in *Muniz* to "routine booking questions" asked "to secure the biographical data necessary to expedite booking or pretrial services." *Id.* But the premise of the *Muniz* plurality was that the defendant was already subject to "booking" and therefore such "biographical data" was not investigatory and, thus, was exempt from *Miranda's* application. The ordinary English usage of the verb to *book* means that the defendant is already arrested.[6] That is to say, he could not have been *booked* unless he was arrested, and if such "routine booking questions" are to receive the *Muniz* vaccine they must be made as part of a lawful arrest. Manifestly, here they were not.

The Government's argument thus drives us to reaffirm our October 26 holding that Ortiz was arrested in the jetway. The information obtained minutes after that unlawful event was therefore necessarily linked to it.[7]

A simple hypothetical further demonstrates the extravagance of the argument the Government makes here. Late one night three police officers randomly burst into a Philadelphia row home. They wake up the occupant and rummage through the house. Six to eight minutes later, one of the officers sees a card on a nighttable, bearing the name "Jose Ortiz." The occupant admits that is his name, and a computer check reveals three arrest warrants outstanding in that name. Ortiz is arrested. While leaving, Ortiz identifies the black bag near the card as his. The bag contains fourteen bricks of cocaine.

To accept the Government's argument here and apply it to the hypothetical, we would not suppress the bag's contents because the arrest would not be unlawful and "not achieved through the exploitation" of the illegal search.[8] But to find no link or "taint" in such a case would be to repeal the Fourth Amendment. The temporal and physical proximity of the identity admission to the wantonly unlawful search shows it to be the sap of the same poisoned tree.

We are ultimately fortified in our rejection of the Government's post-decision afterthoughts by referring to the law review commentary the Government proffered to us. The purpose of *Wong Sun* surely is "to prevent future violations, not punish past ones." To excuse what Detective Kosmalski did in this case, as the Government for the fourth time urges us to do, would be to encourage the lawlessness that took place here. Any modern air traveller can easily recognize himself or herself walking onto a jetway holding carry-on baggage, and looking remarkably like Ortiz on July 13, 1993. In order to protect those countless and innocent passengers from the kind of unwarranted seizure that occurred as Delta flight 904 discharged its passengers that day, we must adhere to our October 26, 1993 ruling and reject the Government's *esprit de l'escalier.*

## ORDER ON RECONSIDERATION

AND NOW, this 8th day of November, 1993, upon consideration of the Government's motion to reconsider the Court's ruling of October 26, 1993 suppressing evidence, the defendant's response, and for the reasons set forth in the foregoing Memorandum, it is hereby ORDERED that the Government's motion is DENIED.

---

6. To *book* someone is to "make an entry of or against a person's name; *esp.* to enter (a name) in a police register for an alleged offense", II *The Oxford English Dictionary* 396, col. 2, def. 1.c. (2d ed. 1989).

7. It is also worth noting that it tortures reality to ask us to imagine that Ortiz was arrested in the jetway and then eight minutes later the same officer arrested him again even though Ortiz never left the custody of that officer.

8. This locution is the Government's at p. 1 of its reconsideration motion.