**UNITED STATES of America,**

v.

**Marco BURTON and Maurice Smith, Defendants.**

No. 99–109.

United States District Court, E.D. Pennsylvania.

Feb. 25, 2000.

M. Taylor Aspinwall, Philadelphia, PA, for plaintiff.

Brian McMonagle, Edward Reif, Philadelphia, PA, for defendants.

### MEMORANDUM & ORDER

DUBOIS, District Judge.

### ORDER

AND NOW, to wit, this 25th day of February, 2000, upon consideration of Motion to Suppress Physical Evidence of Defendant Marco Burton (Document No. 20, filed May 13, 1999), Government's Response to Defendant's Motion to Suppress (Document No. 22, filed, June 30, 1999), Motion of Defendant Maurice Smith to Join in the Motion to Suppress of Co–Defendant, Marco Burton (Document No. 32, filed July 15, 1999), Supplemental Memorandum of Law in Support of Defendant Marco Burton's Motion to Suppress Physical Evidence (Document No. 53, filed September 21, 1999), and Motion of Defendant Maurice Smith to Join in the Supplemental Memorandum of Law in Support of Motion to Suppress of Co–Defendant, Marco Burton (Document No. 54, filed September 24, 1999), and following a Hearing and Oral Argument on February 11, 2000, for the reasons stated in the attached Memorandum, it is **ORDERED** that Motion of Defendant Marco Burton, joined by Defendant Maurice Smith, to Suppress Physical Evidence is **DENIED**.

### MEMORANDUM

Presently before the Court is the motion of defendant Marco Burton ("Burton") to suppress physical evidence, joined by defendant Maurice Smith ("Smith" and, together with Burton, "defendants"). The defendants seek to suppress the evidence seized pursuant to two search warrants, one for a black Nissan Maxima ("Maxima"), and one for Burton's home, located at 2543 North Garnet Street, Philadelphia, Pennsylvania ("2543 Garnet"). For the reasons that follow, the Court denies the motion.

### I. BACKGROUND

On January 26, 1999, agents of the United States Drug Enforcement Agency ("DEA") Task Force (the "Task Force") had under surveillance the 2800 block of North Darien Street in Philadelphia—a block on which DEA agents suspected drug activity to be occurring. As part of this surveillance operation, the Task Force agents assigned a Confidential Source ("CS") to purchase an ounce of cocaine and an ounce of heroin from a suspected drug dealer, Mel Santiago ("Santiago"). The CS was sent to the 2800 block of North Darien Street wearing a microphone through which the Task Force agents could hear the CS' conversations.

When the CS arrived at the 2800 block of North Darien Street, he was told that Santiago was in one of the houses, 2851 North Darien Street ("2851 Darien"), concluding a large drug transaction. The CS was told that he could not meet with Santiago until Santiago concluded the transaction. After waiting for some time, the CS attempted to enter 2851 Darien to see Santiago. He was prevented from doing so, and had to shout to tell Santiago that he was there. Santiago told the CS to wait outside. While the CS was waiting, he spoke to one of Santiago's associates, who told the CS that Santiago was concluding a "five brick" deal. The Task Force agents listening to this conversation understood that to mean a one kilogram transaction.

At approximately 4:15 PM, a man later identified as Burton left 2851 Garnet Street carrying an opaque bag. He placed the bag in the trunk of the Maxima and drove away. The Task Force agents followed Burton, and radioed for assistance from the Philadelphia Police Department. Burton drove the Maxima to the 2500 block of North Garnet Street in Philadelphia, where he parked it. At approximately 4:30 PM, as Burton exited the Maxima and began to walk down the street, he was stopped by Dennis Bauer ("Officer Bauer"), a Philadelphia Police Officer assigned to the Highway Patrol.[1] Officer Bauer exited his car, drew his weapon, and

---

1. Bauer was not assigned to the Task Force, but responded to the Task Force agents' request for assistance.

told Burton to stop. Officer Bauer testified that Burton continued to walk, and put his hand into his jacket, as though he had a gun. At that point, Officer Bauer again told Burton to stop. At about the same time, other police and Task Force agents arrived on the scene. Burton then complied with the order to stop, turning around and raising his hands.

Officer Bauer frisked Burton, and found no weapons. The officers at the scene then asked Burton where he lived, and he gave them a variety of addresses. Eventually, Burton told them he was going to 2543 Garnet Street, where he lived with his grandmother. Officer Bauer then handcuffed Burton and placed him in a police car. The officers on the scene then called for a drug-sniffing dog to inspect the Maxima.

At or about this time, Officer Bauer testified that he observed a man later identified as Maurice Smith peeking out of a second floor window of 2543 Garnet. Officer Bauer testified that the way Smith was looking at them "just didn't feel right," so Officer Bauer called Smith's presence to the attention of other officers. As a result, two of the Task Force agents on the scene, Special Agent Richard Reck ("Agent Reck") and his partner, Special Agent Jim Corbett ("Agent Corbett"), went to 2543 Garnet to speak with Smith.

Agent Reck testified that he and Agent Corbett went to 2543 Garnet, and ordered whomever was inside to come outside. According to Agent Reck, it took an unusually long time before Smith came to the door. Agent Reck and Agent Corbett spoke with Smith for approximately 15 minutes on the stoop of 2543 Garnet. During this time, Agent Reck asked Smith if Smith lived at 2543 Garnet. In response, Smith told the agents that he stayed at 2543 Garnet, and later in the conversation told them that he stayed at 2543 Garnet "sometimes." Smith also informed the agents that the house was "Marco's house," pointing to Burton, and that Smith lived around the corner. During the course of the conversation, Smith repeatedly asked if he could go inside to get his jacket, but the agents told him he should stay there and answer their questions.

Towards the end of the conversation, the two agents were joined by Group Supervisor Marty Kaplan ("GS Kaplan"), the supervisory agent on the scene. Agent Reck testified that GS Kaplan had been an intermittent participant in the agents' questioning of Smith, but Agent Reck could not recall which portions of the questioning GS Kaplan heard. GS Kaplan asked Smith if anyone else was in the house, and Smith said no. GS Kaplan then asked Smith if the agents could enter 2543 Garnet to see if anyone else was inside the house. Smith gave GS Kaplan permission to enter the house, and the agents did so.

Once inside the house, the agents conducted a protective sweep to determine if anyone else was in the house (the "protective sweep"), and found no one. However, the agents did find, in plain view, drug paraphernalia, including a scale, a plate, and a razor blade, all covered in a white powdery residue. Agent Reck testified that he believed, based on his experience, that this white powder was cocaine. All of these items were found in the front bedroom of 2543 Garnet, the room from which the officers observed Smith watching them.

Around 5:45 PM, Anthony Ragin ("Officer Ragin"), a Philadelphia Police Officer assigned to the K–9 unit, arrived with his dog, JT. Officer Ragin testified that JT, a trained drug-sniffing dog, sniffed the Maxima, and alerted to the trunk, indicating that there were drugs in the trunk of the Maxima.

Based on all of this information, the DEA sought, and received, two search warrants, one for 2543 Garnet and one for the Maxima. The applications for both search warrants relied upon identical affidavits. In those affidavits, Daniel McEwan ("Officer McEwan"), a Philadelphia Police Officer assigned to the Task Force, swore to many of the facts recited above, including the drug activity taking place on the 2800 Block of North Darien Street, the conversations that the officers had with Burton and Smith, the results of the protective sweep, and JT's alert to the trunk of the Maxima.

The Task Force agents subsequently executed the two search warrants. In the trunk

of the Maxima, the agents discovered approximately $45,608 and a Ruger 9mm handgun. As a result of the search of 2543 Garnet, the officers located and seized a package under a bed containing 742 grams of cocaine, a package containing 7.9 grams of cocaine and another handgun between the mattress and the box spring in the front bedroom, and the scale, plate, and razor blade that the officers had seen earlier during their earlier protective sweep of the house.

Defendants now ask this Court to suppress all of this evidence as having been seized in violation of their rights under the Fourth Amendment.

## II. DISCUSSION

■ In suppression hearings, the burden of proof is on the government to prove, by a preponderance of the evidence, that the search in question was reasonable. *See United States v. Matlock,* 415 U.S. 164, 178, n. 14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974). This standard requires that the government in this case prove by a preponderance of the evidence that the searches of the Maxima and of 2543 Garnet were reasonable under the Fourth Amendment.

Defendants argue that Officer Bauer effectively arrested Burton when he stopped Burton, and that such arrest was not made pursuant to probable cause. As a result, defendants argue that all subsequent seizures by the police are invalid because the original stop was improper. Defendants also argue that the protective sweep of 2543 Garnet was improper, because the police lacked a warrant, lacked exigent circumstances, and had no valid consent to enter the premises. As a result, defendants contend that the subsequent search of 2543 Garnet was invalid.

In response, the government argues that the initial stop of Burton was an appropriate *Terry* stop, and that the police had reasonable suspicion to stop Burton. The government also contends that, after the drug-sniffing dog alerted to the Maxima, the agents had probable cause to search the Maxima,

and that, in searching the Maxima, the agents were acting pursuant to a valid warrant. As to the protective sweep, the government argues that Smith gave the officers valid consent for the protective sweep, and that, even if he did not, the officers were justified in relying on Smith's consent. Finally, the government argues that there was probable cause for the issuance of the search warrant for 2543 Garnet, and, if not, the officers relied on the warrant in good faith.

### A. The *Terry* stop

#### 1. Reasonable suspicion to stop Burton

■ Pursuant to the rule announced in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), a police officer may stop an individual and initiate a brief investigatory detention if the individual's behavior raises suspicion of criminal activity. *See id.* at 22–24, 88 S.Ct. 1868. However, the officer's suspicion must be based upon specific and articulable facts which, taken together with the rational inferences from those facts, reasonably imply that a crime has been committed or that some criminal activity is afoot. *See id.* at 30, 88 S.Ct. 1868; *United States v. Rickus,* 737 F.2d 360, 365 (3rd Cir.1984). In determining whether an officer's suspicion amounts to a reasonable suspicion, the Court should consider the totality of the circumstances. *See United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). Applying this standard to the instant case, the Court concludes that the officers had reasonable suspicion to stop Burton on January 26, 1999.

The DEA agents had reliable information that the block to which they sent the CS on the afternoon of January 26—the 2800 block of North Darien Street—was an area in which heavy drug activity was occurring.[2] When the CS arrived, he was told that Santiago was involved in a "five brick" deal, which the agents immediately understood to mean a one kilogram purchase of cocaine. When the CS attempted to enter 2851 Darien, he

---

2. Officer McEwen testified that, subsequent to January 26, 1999, indictments were handed down concerning the activity on the 2800 block

of North Darien Street. These indictments relate to activity both before and after January 26, 1999.

was not permitted to do so, but he was able to observe large quantities of money. Accordingly, he was able to confirm that Santiago was consummating a large deal inside of 2851 Darien, a fact which he immediately reported to Officer McEwan. After approximately 40 minutes, the agents on the scene observed Burton leaving 2851 Darien carrying an opaque bag, which he placed in the trunk of the Maxima.

■ Defendants argue that the police could not have had a reasonable suspicion regarding Burton, because neither the CS nor any of the agents ever saw Burton engaged in a drug transaction at 2543 Darien. Therefore, argue defendants, the police have not sufficiently linked Burton to the illegal conduct occurring inside of 2851 Darien. As defendants point out, mere proximity to a suspected drug location is insufficient to create reasonable suspicion on the part of police. *See Sibron v. New York,* 392 U.S. 40, 62–63, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); *Brown v. Texas,* 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979).

■ However, in this case, the police had more information than in cases in which defendants were only observed in the area of illegal conduct. Specifically, the agents knew that, when the CS attempted to enter 2851 Darien, he was rebuffed, and told that he would have to wait outside until Santiago completed a drug transaction. Approximately 40 minutes later, the agents observed Burton exit the building. In considering whether officers had a reasonable suspicion to stop a suspect, the police are not limited to the bald facts that they observe, but may also make rational inferences from those facts. *See Terry,* 392 U.S. at 21, 88 S.Ct. 1868.

■ The Task Force agents not only suspected that there was a drug transaction occurring inside of 2851 Darien, but they were told by the CS that men apparently working for Santiago were controlling the area. Those men would not allow the CS into the building until the transaction was completed. The Task Force agents also were told that the participants required approximately 40 minutes to count the money involved in the transaction and complete the transaction. Given the knowledge that 2851 Darien was a controlled environment, it was reasonable for the Task Force agents to infer that, after approximately 40 minutes, the man who walked out of 2851 Darien carrying a bag was likely the other party to the drug transaction that took place there. Accordingly, the officers had a reasonable suspicion to stop Burton.

### 2. Scope and duration of the *Terry* stop

■ Defendants argue that Burton was not merely stopped, but actually arrested. In performing a *Terry* stop, officers must employ the least intrusive means of detention and investigation, both in terms of scope of the investigation and duration of the investigation. *See Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). If police exceed the least-intrusive means of detention and/or investigation, a *Terry* stop can ripen into an arrest. *See United States v. Sharpe,* 470 U.S. 675, 685–86, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985); *Dunaway v. New York,* 442 U.S. 200, 212, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979). It is the government's burden to demonstrate that any detention or seizure justified on the basis of reasonable suspicion was sufficiently limited in scope and manner to satisfy the requirements of *Terry. See Royer,* 460 U.S. at 500, 103 S.Ct. 1319.

■ In the instant case, Officer Bauer approached Burton with his weapon drawn. Further, upon stopping Burton, Officer Bauer handcuffed him and placed him in a police car. At the outset, the Court notes that the officers suspected Burton of drug trafficking, a crime which is often accompanied by violence. Thus, Officer Bauer was not unreasonable in approaching Burton with his weapon drawn. *See United States v. Navarrete–Barron,* 192 F.3d 786, 791 (8th Cir.1999).

■ As to the use of the handcuffs, this, too, was not unreasonable. The officers suspected that Burton was involved in drug trafficking, and they needed to secure the area, including the passenger compartment of the Maxima. Generally, the use of hand-

cuffs is appropriate while officers conduct a protective sweep of a vehicle's passenger compartment and secure the scene. *See United States v. Shareef,* 100 F.3d 1491, 1507 (10th Cir.1996). Furthermore, officers may leave a suspect in handcuffs for a reasonable time thereafter, while the officers on the scene assess the situation. *See id.* In this case, defendant was handcuffed and in the police car for less than an hour, according to the testimony of Agent Reck.

Defendants challenge the use of the handcuffs, relying on *United States v. Ortiz,* 835 F.Supp. 824 (E.D.Pa.1993). In *Ortiz,* the court considered a situation in which Philadelphia police officers received a tip that a passenger arriving on a flight to Philadelphia was trafficking in drugs. *See id.* at 826. Philadelphia police officers confronted the man as he exited the airplane, while he was still on a jetway. *See id.* The officers told the defendant in *Ortiz* to place his hands on the wall, which he did, and frisked him. *See id.* Finding no weapon and no drugs, the officers handcuffed the defendant, placed him in a police car, and drove him to the police station at the airport. *See id.* The officers then removed the handcuffs and questioned the defendant. *See id.* All told, the defendant in *Ortiz* was handcuffed for approximately six to eight minutes. *See id.*

The court in *Ortiz* ruled that, when the officers handcuffed the defendant in *Ortiz,* they arrested him. *See id.* at 828. "Common sense and ordinary human experience . . . can only describe this jetway handcuffing by three armed police officers as an arrest." *Id.* In reaching this conclusion, the court focused on the fact that the defendant had not offered any resistance to the officers when he was stopped by the officers, and the fact that there were three armed police officers and only one defendant.

In the instant case, like in *Ortiz,* the officers on the scene vastly outnumbered the suspects. Furthermore, in both cases, the defendants were suspected of drug trafficking, and were found, after a frisk, not to have weapons. However, this case presents other circumstances that were not present in *Ortiz,* and which the Court finds justify the use of handcuffs in this case.

In *Ortiz,* once the police had stopped the defendant, they received total cooperation. In this case, Officer Bauer testified that Burton did not comply immediately with his order to stop. Furthermore, Officer Bauer testified that Burton reached into his jacket in a threatening manner. In addition to this non-compliance on Burton's part, albeit of short duration, there are other factors present in this case to justify the use of the handcuffs.

Unlike in *Ortiz,* the police in this case had a number of tasks to perform that would divert their attention away from Burton. The officers needed to conduct a protective sweep of the Maxima. At the same time, the officers concluded that, for safety reasons, some of them needed to speak with Smith, who was in 2543 Garnet, and thereafter conduct the protective sweep of the premises. Finally, unlike *Ortiz,* all of these events took place on an open street, rather than in the more closed environment of an airport jetway. Accordingly, the officers in this case had to secure a more expansive crime scene than was involved in *Ortiz.* All of these factors, different from those presented in *Ortiz,* taken together, suggest that, in light of common sense and ordinary human experience, the police were justified in using handcuffs during the *Terry* stop.

■ The other issue for the Court to consider in determining whether the *Terry* stop developed into an arrest is the duration of the stop. There is no bright line test for the Court to apply in determining whether a *Terry* stop ripens into an arrest. *See Houston v. Clark County Sheriff's,* 174 F.3d 809, 815 (6th Cir.1999). Rather, "when an officer's initial queries do not dispel the suspicion that warranted the stop, further detention and questioning are appropriate." *Id.* If the authorities are pursuing a diligent course of investigation "likely to confirm or dispel their suspicions quickly," courts "should not indulge in an unrealistic second-guessing." *Sharpe,* 470 U.S. at 685, 105 S.Ct. 1568.

Here, Burton was in custody for less than an hour, much of which was spent waiting for Officer Ragin and JT. Time spent waiting for a drug-sniffing dog is time spent pursuing a

course of investigation likely to confirm or dispel officers' suspicions. *See United States v. Vega*, 72 F.3d 507, 516 (7th Cir.1995). Furthermore, the time of the *Terry* stop here was less than others approved by courts. *See, e.g., United States v. McCarthy*, 77 F.3d 522, 531 (1st Cir.1996) (seventy-five minutes); *Vega*, 72 F.3d at 516 (62 minutes); *United States v. McGrath*, 89 F.Supp.2d 569 (E.D.Pa.2000) (more than one hour). Thus, the Court concludes that the length of the *Terry* stop in this case did not cause it to ripen into an arrest.

### B. The protective sweep

The police searched 2543 Garnet twice—during the protective sweep and again pursuant to a warrant. Upon searching 2543 Garnet during the protective sweep, the police discovered drug paraphernalia, including a balance scale, a razor blade, and a plate, in plain view. All of these items were covered in a white powder which Agent Reck testified he suspected of being cocaine. Upon returning with a warrant to search 2543 Garnet, the police discovered 742 grams of cocaine and 7.9 grams of cocaine base in addition to the drug paraphernalia.

Defendants argue that the protective sweep violated their rights under the Fourth Amendment because the police had no warrant to enter 2543 Garnet and no exception to the warrant requirement applied. Defendants further argue that, because the protective sweep was illegal, any information obtained from the protective sweep, including the cocaine and cocaine base, must also be suppressed. The government contends that Smith validly consented to the protective sweep, and that the police justifiably relied on his consent. The government also argues that the police were justified in entering 2543 Garnet to conduct the protective sweep because the officers on the scene feared for their safety.

 The Fourth Amendment requires that police obtain a warrant, supported by probable cause, to conduct a search into an area in which an individual has an expectation of privacy. *See Illinois v. Rodriguez*, 497 U.S. 177, 180–81, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). However, where police

discover an item in their plain view, they are not required to obtain a warrant. *See United States v. Benish*, 5 F.3d 20, 24 (3d Cir. 1993). "Under the plain view exception, law enforcement authorities must have been lawfully on the premises, the discovery must have been inadvertent, and the incriminating nature of the item must have been immediately apparent." *United States v. Scarfo*, 685 F.2d 842, 845 (3d Cir.1982) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 464–73, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)).

There is no argument that the discovery of the drug paraphernalia was not inadvertent. The evidence at the suppression hearing revealed that the officers who conducted the protective sweep did so to determine whether there was anyone else inside 2543 Garnet. When they reached the front bedroom, they found, on the dresser, the drug paraphernalia described above. Further, Agent Reck testified that the incriminating nature of the items was immediately apparent to him, based on the type of items, and the fact that he immediately suspected the white powder on the drug paraphernalia to be cocaine. Defendants argue, however, that the officers had no right to be inside 2543 Garnet. If an officer is not lawfully on the premises from which he observes an item in plain view, the search violates the Fourth Amendment. *See Scarfo*, 685 F.2d at 845.

 The Fourth Amendment generally prohibits the warrantless entry into a person's home, either to search or to make an arrest. *See Rodriguez*, 497 U.S. at 181, 110 S.Ct. 2793. "Freedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment." *Payton v. New York*, 445 U.S. 573, 587, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). To search a person's home, the police must ordinarily get a warrant based on probable cause. *See id.* at 586, 100 S.Ct. 1371. Warrantless searches are presumptively unreasonable under the Fourth Amendment. *See id.* However, certain circumstances can excuse the warrant requirement, including exigent circumstances, police safety, and consent to the search by one with the power to give such consent. *See Parkhurst v. Trapp*, 77 F.3d 707, 711 (3d Cir.

1996); *Warden v. Hayden,* 387 U.S. 294, 298–99, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *Rodriguez,* 497 U.S. at 181, 110 S.Ct. 2793.

The government states that, when Smith consented to the protective sweep, he obviated the need for the police to obtain a warrant. Defendants argue that Smith's consent to search 2543 Garnet was invalid because Smith neither owned nor lived at 2543 Garnet. Defendants also argue that the agents who spoke with Smith should have known that he did not have the authority to consent to a search of 2543 Garnet, and that the agents were therefore unreasonable in relying on Smith's consent.

The prohibitions of the Fourth Amendment do not apply to situations in which the police obtain consent to search, either from the individual whose property was searched, or from a third party who possesses common authority over the premises. *See Rodriguez,* 497 U.S. at 181, 110 S.Ct. 2793. To establish the validity of a third party's consent to a search, the government must demonstrate (1) consent to the search by one with access to the area searched; and, (2) that the consenting party had (a) common authority over that area; (b) a substantial interest in that area; or, (c) permission to exercise the access, either express or implied. *See United States v. Curcio,* 705 F.Supp. 237, 241 (E.D.Pa.1988) (citing and adopting the test from *United States v. Gradowski,* 502 F.2d 563, 564 (2d Cir.1974)).

In the instant case, there is no dispute that Smith had access to 2543 Garnet, because the police found him inside the house. The question of whether Smith had common authority over the premises requires the Court to conduct a Fourth Amendment assumption of risk analysis. *See United States v. Cook,* 530 F.2d 145 (7th Cir.1976); *Curcio,* 705 F.Supp. at 243. Where a property owner gives a party sufficient control of the property such that the property owner has assumed the risk that the third party will consent to a search of the property, the third party will have common authority to consent to a search of those premises. *See Cook,* 530 F.2d at 146.

In the instant case, Smith had common authority over 2543 Garnet. Smith told the officers that he stayed at 2543 Garnet; he later said that he sometimes stayed at 2543 Garnet. *See United States v. Gambina,* 122 F.3d 1058, 1997 WL 383493, at *2 (2d Cir. July 9, 1997) (finding that a woman who had keys to an apartment, had some possessions there, and told officers that she "stayed in the apartment at times" had common authority to consent to a search). Furthermore, Burton had departed, and apparently entrusted 2543 Garnet to Smith's control. *Cf. Rodriguez,* 497 U.S. at 181, 110 S.Ct. 2793 (finding that there was no actual authority in part because the third party "never went there herself when the [property owner] was not home"). In so doing, Burton expressly or impliedly gave Smith access to the whole of the house. *See United States v. Broaden,* 116 F.3d 1486, 1997 WL 345796, at *2 (9th Cir. June 23, 1997) (finding that where a property owner left a babysitter in control of an apartment, the property owner assumed the risk that the babysitter would consent to a search of the apartment, including the freezer, because the whole house was apparently within the babysitter's control). Because the officers found Smith alone in a home in which, at the very least, he said he sometimes stayed, the Court finds that Smith had actual authority to consent to a search of 2543 Garnet.

The government argues that, even if Smith did not have actual authority to consent to the protective sweep, he had apparent authority to do so. Where an individual without authority to do so consents to a search and the surrounding circumstances would lead a reasonable person to believe that the individual has the authority to give such consent, the consent will be considered valid. *See Rodriguez,* 497 U.S. at 188, 110 S.Ct. 2793. The existence of apparent authority to consent to a search involves a three-part analysis: (1) did the searching officer believe some untrue fact that was then used to assess the consent-giver's use of and access to or control over the area searched; (2) was the consent given under circumstances objectively reasonable to believe that the fact was true; and, (3) assuming the truth of the reasonably believed but

**242**

untrue fact, would the consent-giver have had actual authority. *See United States v. Fiorillo*, 186 F.3d 1136, 1144 (9th Cir.1999).

In the instant case, any mistakes of fact that might have been made by the Task Force agents were reasonable, given that the Task Force agents had not been investigating Burton before that day, and given Burton's unwillingness to give Officer Bauer his address when first asked. Additionally, because the Task Force agents found Smith alone at 2543 Garnet, apparently in control of the premises, it was reasonable for them to rely on his statements that he stayed at 2543 Garnet. Considering all of these factors, the Court finds that any error that the Task Force agents made as to Smith's status at 2543 Garnet Street was reasonable. The Court further finds that, if the facts had been as the Task Force agents believed them to be, Smith would have had actual authority to consent to the search. Thus, Smith had apparent authority to consent to the search, and the Task Force agents were reasonable in relying upon his consent.

In view of the Court's findings with respect to Smith's actual or apparent authority to consent to the search, the officers who conducted the protective sweep were legally on the premises, and the evidence they found in plain view could properly serve as a basis for issuance of the search warrant.

### C. The search warrants

#### 1. The Maxima

Defendants argue that the money and the gun found in the Maxima should be suppressed, because the search of the Maxima was made without a warrant, and without probable cause. Defendants also argue that, because the affidavit supporting the warrant to search the Maxima relied upon information obtained illegally, that warrant is invalid. The government responds that the police had probable cause to search the Maxima, and that the officers had a valid warrant for search of the Maxima. The Court concludes the Maxima was searched pursuant to a valid search warrant and that the search of the Maxima did not violate Burton's rights under the Fourth Amendment.

Initially, the Court holds that the search warrant for the Maxima was valid. Defendants are correct in their contention that illegally discovered evidence cannot serve as the basis for probable cause for a search warrant. *See Alderman v. United States*, 394 U.S. 165, 177, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969); *United States v. Williams*, 604 F.2d 1102, 1123 (8th Cir.1979). However, the Court has ruled that Smith validly consented to the protective sweep. Thus, the information contained in the warrant was properly obtained, and supports a finding of probable cause to search the Maxima.

Even if the information discovered during the protective sweep was improperly obtained, the police still had probable cause to search the Maxima. Where an affidavit contains sufficient probable cause to support a warrant apart from any illegally discovered evidence, the warrant is still valid. *See United States v. Herrold*, 962 F.2d 1131, 1141 (3d Cir.1992).

Assuming *arguendo* that the information obtained in the protective sweep is redacted from the affidavit in support of the warrant to search the Maxima, the affidavit still contained facts sufficient to support a finding of probable cause. The affidavit included the facts which caused the police to stop Burton, and the fact that the drug-sniffing dog alerted to the trunk of the car. The alert of the drug-sniffing dog, on its own, constitutes probable cause for the police to search the Maxima. *See Karnes v. Skrutski*, 62 F.3d 485, 498 (3d Cir.1995); *United States v. Massac*, 867 F.2d 174, 176 (3d Cir.1989). Accordingly, even if the information gained from the protective sweep of 2543 Garnet was improperly obtained under the Fourth Amendment, the warrant to search the Maxima was still supported by probable cause. Thus, defendants' motion to suppress the search of the Maxima is denied.

#### 2. The search of 2543 Garnet

Defendants argue that, because the information obtained in the protective sweep was obtained illegally, the warrant to search 2543 Garnet was not supported by probable cause.

The government responds that the evidence obtained in the protective sweep was properly obtained, and that, even if it was not, the officers who executed the search warrant relied on the warrant in good faith.

As noted above, a warrant cannot be supported by illegally discovered evidence. *See Alderman*, 394 U.S. at 177, 89 S.Ct. 961; *Williams*, 604 F.2d at 1123. However, the Court has already concluded that Smith consented to the protective sweep, and that he had the authority to do so. Accordingly, the information from the protective sweep was not illegally obtained, and could serve as probable cause in support of the warrant. Thus, the warrant to search 2543 Garnet was valid, and the Court need not consider whether the police relied on the warrant in good faith.

## III. CONCLUSION

The police had reasonable suspicion to stop Burton. Smith consented to the protective sweep of 2543 Garnet, and the evidence found during the protective sweep was in plain view of the officers. The facts set forth in the search warrants established probable cause to search both the Maxima and 2543 Garnet. Therefore, Burton's motion to suppress physical evidence, joined by Smith, is denied.