**UNITED STATES of America, Plaintiff,**

v.

**Cyril McCRAY, Defendant.**

**Criminal Action No. 00–068–GMS.**

United States District Court, D. Delaware.

June 7, 2001.

Keith M. Rosen, Assistant United States Attorney, Wilmington, DE, for plaintiff.

Penny Marshall, Assistant Federal Public Defender, Wilmington, DE, for defendant.

## *MEMORANDUM OPINION*

SLEET, District Judge.

### I. INTRODUCTION

On October 10, 2000, Cyril McCray ("McCray") was indicted for possession of a firearm by a felon. *See* 18 U.S.C.A. §§ 922(g)(1) and 924(a)(2). On December 7, 2000, McCray filed a motion to suppress statements and a handgun arising out of events preceding his arrest on August 14, 2000. *See* Fed.R.Crim.P. 12(b)(3) (1999). After considering the evidence introduced at the suppression hearing and the arguments of the parties, the court concludes that the police did not have reasonable suspicion to stop McCray, and that the government has not established that he abandoned the gun prior to being seized. For these reasons, McCray's motion to suppress will be granted.

### II. FACTUAL BACKGROUND [1]

On March 14, 2001, the court held an evidentiary hearing to resolve McCray's motion to suppress. At the hearing, the Government called Officers Ronald Muniz and David Prado of the Wilmington Police Department. McCray called Deneatra Wallace. McCray did not testify.

On August 14, 2000, at approximately 10:45 p.m., Officers Ronald Muniz and David Prado of the Wilmington Police Department were on routine patrol in the area of Seventh and Jefferson Streets, Wilmington, Delaware. The officers were in uniform and were driving a marked patrol car. Both officers described the area around Sixth and Seventh and Jefferson Streets as a residential neighborhood with a high degree of drug traffic.

Officers Muniz and Prado have both worked for the Wilmington Police Department for nearly two years as patrol officers. Officer Prado had no prior law enforcement experience before working for the Wilmington Police Department. Officer Muniz, however, had worked for approximately two and a half years as an arson investigator before working as a Wilmington Police Officer.

As the officers came upon the corner of Seventh and Jefferson Streets, they observed an individual they believed to be Gerry Bellflower ("Bellflower") crossing Jefferson Street. According to Officer Muniz, Bellflower was a subject with whom he had prior contact and whom "he believed was involved in drug activities." Police intelligence reports indicated that Bellflower had recently moved from New York and was trying to "make a name for himself" in the area. The officers claimed that they had previously stopped Bellflower for loitering in the neighborhood at least once.[2] Upon seeing Bellflower, the

---

**1.** Because there is contradictory testimony regarding the events that occurred on the evening of McCray's arrest, the court will describe the testimony offered at the suppression hearing. Consistent with Rule 12(e) of the Federal Rules of Criminal Procedure, the court will state its essential factual findings in its discussion of the issues before the court.

**2.** Although both officers claimed that Bellflower had been stopped for loitering, the

officers turned off the lights of the patrol car, circled the block, and came up Seventh Street.

After coming around the block, Officer Muniz stated that he saw Bellflower huddled with two other people (one African–American male and one African–American female) facing each other with their hands above their waists engaged in what he believed to be a drug transaction.[3] Officer Muniz described the lighting conditions as "medium darkness," not completely dark but "quite dark." Officer Muniz could distinguish shapes and forms, but not details.[4] When the officers stopped their car, Officer Muniz stated that all three individuals dropped their hands and lined up facing him. Officer Muniz admitted that he could not see the hands of any of the people, nor did he see anything pass from one hand to another.

Officer Muniz exited the car and began to approach McCray and the unknown female.[5] Officer Prado focused his attention on Bellflower. Officer Prado told Bellflower to come over to the patrol car and to put his hands on the front of the car while Officer Muniz attended the two other people. Officer Muniz exited the car and approached the other two individuals. They almost immediately began walking west on Seventh Street, away from the scene. According to Officer Muniz, McCray repeatedly stated: "I have nothing to do with this." Officer Muniz felt that McCray was acting very suspicious and nervous. Officer Muniz ordered McCray to stop and "come over here." He claims he stated this order repeatedly. McCray did not heed Officer Muniz's commands and did not stop. Instead, McCray continued to walk away.[6]

Government has offered no other evidence to support this contention.

3. Officer Prado gave a slightly different version of the scene. Officer Prado stated that he observed one female and two males, but did not see them "huddled" together or pass anything from one to another.

4. It is not clear from the testimony whether the lighting was sufficient to observe any of the individuals' actual conduct and appearance There is a discrepancy in the officers' testimony about whether there was a street light on the corner where the individuals were standing. However, it appears from their testimony that the lighting may have made it difficult to see that evening. In particular, Officer Muniz first stated that his view was obscured because the people were wearing coats. When questioned about this, since it was August, he stated that he couldn't see their hands because the people had on dark clothing. In contrast, Officer Prado stated that McCray was wearing a long sleeved, light-gray shirt and jeans. When questioned, Officer Prado described McCray's clothing as a "light colored gray shirt."

5. Officer Prado testified that they [he and Officer Muniz] often call people over to get their names even though they have not been seen with drugs or other contraband. Officer Prado described the stop of McCray as a "normal pedestrian stop." According to Prado, the purpose of these stops is to find out a person's identity and "business abroad." Officer Prado testified that "We do this in the high drug neighborhoods." When questioned about whether he would stop people concerning their "business abroad" in non high drug areas, Officer Prado stated that "if we see an individual in a certain area and they haven't left that area and we don't know who they are, we'll stop and find out who they are." The court then asked the officer if he stopped someone who didn't want to talk to him, but instead just walked away, would he make an effort to stop that person. Officer Prado replied, "At that point, no. I mean you didn't do anything that was going to hurt me, no."

6. Officer Prado cannot verify Officer Muniz's version of events because his attention was focused on Bellflower. Although Officer Prado was not listening to Officer Muniz, he believed that McCray was resisting. Specifically, he remembers that McCray continued to leave with Officer Muniz jogging after him. He also believed that McCray did not "give up his hands."

As McCray began walking away, Officer Muniz claims he saw him reach his right hand into his waistband and grab an unknown object. Officer Muniz claims that McCray then threw the object into an open backyard adjacent to the street. After he threw the object, McCray began to quicken his pace and began running in a northwest direction across the yard into which he had thrown the object. Officer Muniz gave chase, and continued ordering McCray to stop.

After running about ten to fifteen feet from the corner, Officer Muniz claims that McCray turned around and assumed a combative stance. Officer Muniz ordered McCray to get on the ground. McCray did not comply, and instead, approached him. In response, Officer Muniz struck McCray in the leg with his baton and continued to order him to the ground. At this point, Officer Prado arrived to assist Muniz, and the two officers forcibly subdued McCray. During the struggle, Officer Prado admitted to striking McCray around the face, shoulders, and upper body. McCray was the only person injured as a result of the struggle.

After they subdued McCray, Officer Prado performed an external pat down search of McCray. During the search, he asked McCray if he had "anything I should know about." It was then that McCray stated that he had a small quantity of drugs on him. Officer Prado did find a small amount of marijuana and crack cocaine on McCray. The officers then placed him in the patrol car. McCray was not given any Miranda warnings at this point.

About five minutes after the officers subdued McCray, Officer Muniz went to the grassy area where he saw McCray throw the object. During the search of the backyard area, Officer Muniz found a loaded handgun. There were no other people in the backyard at the time, and there was no debris or trash in the area. It took him about five minutes to find the weapon.

Pursuant to standard procedure following the use of force, the officers transported McCray to Wilmington Hospital. The officers did not engage in any conversation with McCray during the trip, nor did they ask McCray any questions. Once they reached the hospital, Officer Prado brought McCray into a room to await medical attention. Officer Muniz advised his supervisor, who had arrived at the hospital, what had transpired, and then drove to the police station to begin the necessary paperwork. Officer Muniz had no further interaction with McCray.

Officer Prado handcuffed McCray to a gurney in the hospital room. He told McCray to have a seat and wait for the nurse, but did not engage McCray in any questioning. While McCray awaited medical attention, Officer Prado took a seat outside the hospital room, just beyond the doorway. According to Officer Prado, he and McCray engaged in small talk during this time. In particular, Officer Prado stated that McCray discussed a date he had planned for the evening. At one point, however, Officer Prado claims McCray asked "Did you all find the gun?" Officer Prado claims that he did not ask McCray any questions, nor did he make any comments to elicit this statement. Officer Prado also claims that he made no promises or threats to McCray to extract the statement about the gun. Officer Prado describes McCray as being calm during this time. However, he also described McCray as having "glassy" eyes during this time. At no time during the events that transpired did either officer advise McCray of his Miranda rights.

McCray called Deneatra Wallace as his sole witness.[7] Wallace was the woman with McCray at the time of his arrest. Wallace lives in the area around Seventh and Jefferson on 6th Street with her mother and son. She has lived in that area for approximately five years. Wallace testified that she has known McCray for between one to two years. On the evening of August 14, 2000, Wallace stated that she was on her way home, but had stopped to talk to McCray. She testified that she had at first been standing in front of McCray's grandmother's house, located in neighborhood of Seventh and Jefferson Streets, but she then walked farther down the street. She testified that she and McCray were having a conversation for eight to nine minutes before the police came upon them.

According to Wallace, they were not talking to a third person at all that evening. She testified that she saw a third person about two or three yards away from where she was standing with McCray. This person was stepping on the sidewalk when the police came from the alley. Wallace described this person as being around 5 feet 8 inches tall, with brown skin, braided hair, a hat and maybe a moustache. Wallace stated that she had seen this person around the neighborhood before.

Wallace stated that the police interrupted their conversation by saying "Hey you come here." She stated that she and McCray kept on walking. She and McCray took a few more steps, but then came to a stop. She then decided to keep walking because she did not want the police to bother her. Wallace testified that she never heard the police say "stop." According to Wallace's version of events, the police did not say much to McCray. Rather, she testified that "[b]asically they didn't have much to say. They were being physically violent with him." Wallace claims that she did not leave the corner completely, but rather, observed the incident while walking away. Wallace testified that she did not lose sight of McCray and that she did not see him throw anything. She also stated that during the incident she did not see anything in McCray's hands nor did she see him with a gun. After McCray was handcuffed, and "they [the cops] were done being physical with him," Wallace testified that she went to McCray's grandmother's house. Neither police officer attempted to talk to her.

## III. DISCUSSION

In his motion to suppress, McCray argues that any evidence seized at the time of his arrest on August 14, 2000 should be suppressed because it was obtained in violation of the Fourth Amendment to the United States Constitution. McCray also argues that any statements taken from him at the time of his arrest should be suppressed because they were obtained in violation of his Fifth and Sixth Amendment rights, and without a knowing and intelligent waiver of those rights. The Government contends that 1) McCray was not seized for Fourth Amendment purposes until the time the officers forcibly stopped him and that the officers had reasonable suspicion of narcotics activity justi-

7. The Government argues that the court should not find Wallace's testimony to be credible in light of her bias and some possibly contradictory statements. The court finds this argument to be without merit. *See* Fed. R.Crim.P. 12(e) (1999) ("Where factual issues are involved in a determination of a motion, the court shall state its essential findings on the record"). As to this witness's alleged bias, despite the Government's characterization of Wallace as a longtime friend of McCray, she testified that she had known McCray for approximately only one to two years. Moreover, the officers' testimony is equally, if not more, contradictory. Thus, the court will not discredit Wallace's testimony.

fying an investigatory stop, 2) any statements made by McCray were uninvited and spontaneous and thus, not the product of custodial interrogation, and 3) the gun should not be suppressed because McCray abandoned it before he was seized.

After considering the evidence presented at the suppression hearing and the arguments subsequently supplied by the parties, the court concludes that Officers Muniz and Prado did not have reasonable suspicion to conduct an investigatory stop of McCray, and that the gun was not abandoned during McCray's alleged attempted flight. Therefore, the court will grant McCray's motion to suppress.

### A. Basis for the Stop

The Fourth Amendment to the United States Constitution protects "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. Police have constitutional authority to conduct a limited investigatory stop, however, if an officer has a reasonable suspicion that criminal activity "may be afoot." *See United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). However, the officer's suspicion must be based upon specific and articulable facts which, taken together with all rational inferences from those facts, reasonably suggest that a suspect has been involved in criminal activity. *See Terry v. Ohio*, 392 U.S. at 30, 88 S.Ct. 1868; *United States v. Rickus*, 737 F.2d 360, 365 (3rd Cir.1984).

In determining whether an officer's suspicion amounts to a reasonable suspicion, the court should consider the totality of the circumstances. *See United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). More-

over, in determining whether a law enforcement officer had reasonable suspicion to justify a *Terry* stop, deference is given to the officer's conclusions based on the officer's experience. *See United States v. Carter*, No.Crim.A.99–50–MMS, 1999 WL 1007044 (D.Del. Oct.22, 1999) (citing *United States v. Brown*, 159 F.3d 147, 149 (3d Cir.1998)). "However, a mere 'hunch' or 'inchoate and unparticularized suspicion' cannot justify a stop and frisk under Terry." *Id.* at *4 (quoting *Brown*, 159 F.3d at 149). "Instead, the officer must have a particularized and objective basis for believing that the particular person is suspected of criminal activity." *Id.* Applying these standards to McCray's case, the court concludes that Officers Muniz and Prado did not have a particularized and objective basis that would establish reasonable suspicion and, thus, justify their stop of McCray on August 14, 2000.

The Government argues that under the totality of the circumstances, the following factors, when considered together, establish that Officers Muniz and Prado had reasonable suspicion to stop McCray on August 14, 2000: 1) the stop occurred late at night in an area, known for narcotics activity, 2) the manner in which McCray was standing with Bellflower, an individual who the police had previously encountered and who was believed to be involved in drug activity, and 3) McCray's alleged unprovoked flight when the officers questioned him. Given the totality of the circumstances, the court is not persuaded by the Government's arguments. The court will address these factors cited by the Government in turn.

### 1. The Area's Reputation for Narcotics Activity and the Late Hour

First, the court concludes that the area's reputation for narcotics activity and the late hour of the evening are not objective factors that contribute to reason-

able suspicion within the context of this stop. *See United States v. Carter*, 1999 WL 1007044 at *4–5 (holding that neither the area's reputation nor the late hour of the evening could be used to establish reasonable suspicion where a stop occurred near a hospital). Although the reputation of an area for criminal activity cannot, standing alone, justify an investigatory stop, *see Brown v. Texas*, 443 U.S. 47, 52, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979); *United States v. Burton*, 193 F.R.D. 232, 238 (E.D.Pa.2000) ("mere proximity to a suspected drug location is insufficient to create reasonable suspicion on the part of police."), when combined with other factors, the high crime nature of an area may support a stop. *See United States v. Brown*, 159 F.3d at 149–50. In this case, the area around Seventh and Jefferson Streets, although considered a high crime area, is also a residential neighborhood. Officer Prado admitted that the area is a residential neighborhood in his testimony. In fact, McCray's grandmother lived very near the scene of the stop. In addition, although 10:45 p.m. is late, it is not unheard of for neighbors in a community to stand outside and talk late on a summer evening. *But see United States v. Dover*, Crim A. No. 96–181, 1996 U.S. Dist. LEXIS 17415, at *11 (E.D.Pa. Nov. 26, 1996) (holding that police officers had reasonable suspicion of criminal activity after observing a group of men huddled around a closed store at 2 a.m.). It is certainly not suspicious conduct for people who know each other to stand in their own community and have a conversation late at night on a summer evening.

### 2. Presence of Gerry Bellflower

Perhaps the least credible aspect of the officers' recounting of events concerns Gerry Bellflower. The Government contends that because McCray was huddled with Bellflower, an alleged loiterer and suspected narcotics dealer, it was reasonable to conclude that he was engaged in a drug transaction. As an initial matter, the Government has failed to establish that McCray and Wallace were actually conversing with Bellflower at all that evening. The officers claim they saw Bellflower, a suspicious character, crossing the street, so they went around the block and then saw him talking to Wallace and McCray. As the officers' testimony indicated, the lighting was very dim that evening. In addition, there is a discrepancy in Officers Prado's and Muniz's testimony as to what was going on between Bellflower, Wallace, and McCray. The officers weren't sure if they were huddled, just having a conversation, or merely standing in a line. Moreover, in light of the officers' unclear testimony, it is just as likely that consistent with Wallace's testimony, a black male, who may have been Bellflower, or who looked like Bellflower, was crossing the street a few yards from where she and McCray were standing. Based on the evidence presented at the hearing, the court cannot credit Muniz's claim that the three were huddled together suspiciously.

Even if Bellflower was standing with Wallace and McCray, the officers still did not have a reasonable suspicion to believe that a drug transaction was occurring. Proximity to a drug dealer can be a factor that gives rise to reasonable suspicion. *See United States v. McGlory*, 968 F.2d 309, 342 (3d Cir.1992) (holding that officer's observation of a known drug dealer approaching the defendant's car gave rise to reasonable suspicion); *United States v. Cruz*, 909 F.2d 422, 424 (11th Cir.1989) (holding that reasonable suspicion justified a *Terry* stop of the defendant when she was walking and talking with known drug dealers who were known to be at the scene to buy and sell cocaine); *United States v. Anderson*, 754 F.Supp.

442, 444 (E.D.Pa.1990) (holding that a group of men standing with known drug traffickers who fled when officers approached established reasonable suspicion). However, the facts in this case suggest no objective factors that would establish reasonable suspicion within the context of this stop. Despite the officers' vague and inconsistent testimony, the one fact upon which both officers agreed is that neither saw anything pass between any of the individuals' hands. In this case, the officers maintain that they were suspicious that a drug transaction was taking place, yet they never saw the parties exchange anything.[8] Observing two individuals who are possibly standing near a known loiterer, even one described as being involved in narcotics activity, without more, merely constitutes an "inchoate and unparticularized suspicion," and cannot justify a *Terry* stop.

The court finds guidance in a *Washington v. Gilmore*, No. C–97–4062 PJH, 1998 WL 774629 (N.D.Cal. Oct.30, 1998), a civil rights case that arose out of a *Terry* stop.[9] In *Gilmore*, the court held that a police officer did not have reasonable suspicion of narcotics activity in a case that is factually similar to McCray's. *Id.* at *7. Officer Gilmore alleged that the defendant made "furtive gestures" like closing her fists and placing her hands towards her chest while in an automobile with a known drug deal-

er. *Id.* Even considering the defendant's proximity to a known drug dealer and the high crime area, the court held that the officer's observations established no more than an " 'inchoate and unparticularlized suspicion or hunch' that the Supreme Court has found insufficient to support a finding of 'reasonable suspicion.' " *See Id.* Moreover, the court found that the officer described no "objective manifestation" that Gilmore was or was about to be engaged in criminal activity. *See id.* (citing *Cortez*, 449 U.S. at 417, 101 S.Ct. 690). In *Gilmore*, the officer was at least certain that the defendant was huddled with a known drug dealer. In this case, the officers cannot even establish that McCray was standing with Bellflower. Therefore, the court finds that Officers Muniz and Prado have offered no objective basis for their contention that criminal activity was afoot.

Furthermore, the court finds it peculiar that Gerry Bellflower,[10] the original target that night, mysteriously disappeared. According to Officer Prado, who focused on Bellflower during the stop, he may have run away, but Officer Prado did not know what happened to him. The Government offered no evidence that Bellflower, whose alleged presence and nefarious character precipatated these events, was questioned at the scene, patted down for drugs or weapons, or that he even complied with the officers' orders to stop. In fact, the

---

8. If the officers had observed some sort of exchange among the parties that might be an objective factor which would give rise to a reasonable suspicion that the parties were engaged in criminal activity. See United States v. Ruiz, No.Crim. A. 98–120, 1998 WL 622405, at *2 (E.D.Pa. Sept. 15, 1998) (finding officer had reasonable suspicion after observing money exchange hands in a high drug area). *See also United States v. Williams*, 139 F.3d 628, 630 (8th Cir.1998) (finding reasonable suspicion where officer observed exchange of drugs and money); *United States v. Garrett*, 1007 (DC Cir.1992) (holding that an officer's observation of exchange of "small

object" and money in a known drug trafficking area constituted reasonable suspicion).

9. Although *Washington v. Gilmore* is a civil case, the court applied a "totality of the circumstances" test to determine if the officer had reasonable suspicion to justify the stop. *See id.* at *6.

10. Although the officers' testimony indicates that Bellflower was a suspected drug dealer, their testimony establishes, at best, that he may have once been ticketed for loitering.

court concludes that the Government's inability to offer any information substantiating Bellflower's presence that evening not only casts doubt on the officers' story, but fails to establish that the third man was actually Bellflower.

Because the officers cannot establish that Bellflower was actually present that evening, or even if he was, that McCray, Wallace, and Bellflower were "huddled" together, and because they observed no other objective manifestations of narcotics activity, the court finds that the officers simply did not have reasonable suspicion to stop McCray.

### 3. McCray's Alleged Flight

Finally, the Government argues that McCray's unprovoked flight established a reasonable suspicion to justify the stop. In support of its position, the Government cites to *Illinois v. Wardlow*, 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) and *United States v. Valentine*, 232 F.3d 350 (3d Cir.2000). In *Wardlow*, the United States Supreme Court held that unprovoked flight from the police in a high crime neighborhood can itself provide sufficient reasonable suspicion to warrant a *Terry* stop. *Id.* at 124–25, 120 S.Ct. 673. In *Wardlow*, police officers patrolling a high crime neighborhood observed the defendant standing next to a building and holding an opaque bag. *Id.* at 121–22, 120 S.Ct. 673. When the defendant saw the police, he fled. *Id.* at 122, 120 S.Ct. 673. The officers gave chase, eventually caught the defendant, and found a handgun during a pat-down search. *Id.*

The facts in McCray's case are clearly distinguishable from *Wardlow*. According to both the officers' and Wal-lace's testimony, McCray and Wallace continued walking when the officers arrived. The record before the court clearly demonstrates that there was not the same sort of unprovoked, headlong flight that there was in *Wardlow*. As the Third Circuit stated in *Valentine*, "[w]alking away from the police hardly amounts to the headlong flight considered in *Wardlow*, and of course would not give rise to reasonable suspicion by itself." 232 F.3d at 357.[11] Based on the record before it, the court determines that under the totality of the circumstances, *Wardlow* is factually distinguishable from this case.

The facts in this case are also distinguishable from *Valentine*. In *Valentine*, the Third Circuit held that officers had reasonable suspicion to stop a defendant "after they received [a] face-to-face tip, were in a high crime area at 1:00 a.m ., and saw [the defendant] and his two companions walk away as soon as they noticed the police car." 232 F.3d at 357. The Government argues that just like in *Valentine* the high drug activity in the area, late hour, presence of Bellflower, and McCray's nervous behavior all support a finding of reasonable suspicion. In this case, however, the totality of the circumstances simply does not establish that the officers had reasonable suspicion within the context of McCray's stop. Most significantly, there was no face-to-face tip that would have provided the officers with a reasonable suspicion of criminal activity. As for McCray's alleged nervous behavior, the Government has not established that McCray's walking away and saying "I have nothing to do with this" constitutes reasonable suspicion under the totality of the circumstances. Although "nervous, eva-

---

11. When police officers approach citizens during a consensual encounter, "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Florida v. Bostick*, 501 U.S. 429, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991).

sive behavior is a pertinent factor in determining reasonable suspicion," *see Valentine,* 232 at 357 (citing *Wardlow,* 528 U.S. at 124, 120 S.Ct. 673), the record before the court, particularly given the limited experience of the officers[12] does not support a finding that the officers had reasonable suspicion. First, only Officer Muniz states that McCray was nervous and evasive. Officer Prado stated in his testimony that he was focused on a man thought to be Bellflower, and only turned his attention to Muniz when he realized that Muniz had extended his asp. He also stated that he was not certain if McCray walked or started to run. Moreover, Wallace, who contends that the officers "became physical" when McCray did not accede to Muniz's instructions, again contradicts both officers testimony. Here we have people who may or may not have been talking with someone who may or may not have been Gerry Bellflower near their homes at 10:45 at night. These unparticularized suspicions and mere hunches do not support a finding of reasonable suspicion. Based on this unclear factual record, the Government has not established that McCray's behavior gave rise to reasonable suspicion.[13]

█ In addition, the court is troubled by the officers' admitted practice of stopping and pursuing individuals simply because they are in a high drug area even if there are no other particularized and articulable facts that criminal activity is afoot. Officer Prado stated to the court that he and his partner often stop individuals in "high drug neighborhoods" to determine their identity and "business abroad." Officer Prado then admitted that if an individual did not want to talk with the police and turned away, that "we would still ask you." As a general rule, a police-citizen encounter will not trigger the protections of the Fourth Amendment unless and until it ceases to be consensual. *Terry,* 392 U.S. at 19 n. 16, 88 S.Ct. 1868; *see also Florida v. Bostick,* 501 U.S. at 434, 111 S.Ct. 2382; *Florida v. Rodriguez,* 469 U.S. 1, 5–6, 105 S.Ct. 308, 83 L.Ed.2d 165, (1984). Police-citizen encounters often progress from consensual encounters to stops, where a citizen is detained briefly for investigative purposes. But this may occur, consistent with the Fourth Amendment, only if the police officer has reasonable suspicion, based on articulable facts, that criminal activity is afoot. *See Terry,* 392 U.S. at 29, 88 S.Ct. 1868; *United States v. Sokolow,* 490 U.S. at 7, 109 S.Ct. 1581. Moreover, when an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business. *Florida v. Royer,* 460 U.S. 491, 498, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). As the court has previously stated, "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Florida v. Bostick,* 501 U.S. at 437, 111 S.Ct. 2382.

█ Based on the record, the court cannot conclude from an objective view-

---

12. The court is mindful that Muniz and Prado had less than two years experience as patrol officers. An officer's experience is taken into consideration in determining if there was reasonable suspicion to justify a stop. *See United States v. Carter,* 1999 WL 1007044, at *3–4.

13. The Government argues that under the Supreme Court's decision in *California v. Hodari D.,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d

690 (1991), McCray was not seized until he was actually subdued by the officers. *Hodari D.,* held that seizure under the Fourth Amendment requires either 1) physical force applied by the police on the suspect; or 2) submission by the suspect to the officer's authority. *See id.* at 626–627 n. 3, 111 S.Ct. 1547. The court agrees and determines that McCray was not seized until he was tackled by the officers.

point, that McCray's conduct on the evening of August 14, 2000 gave rise to a reasonable suspicion that criminal activity was afoot. In determining whether police ha[ve] reasonable suspicion to conduct a stop, "it is imperative that the facts be judged against an objective standard." *Terry,* 392 U.S. at 21, 88 S.Ct. 1868. Thus, an investigatory stop must not be based on subjective hunches, because the Fourth Amendment demands "some minimal level of objective justification to validate" the stop. *See INS v. Delgado,* 466 U.S. 210, 217, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984). Based on the officers' testimony and the testimony of Wallace, it is clear that Officers Muniz and Prado had nothing more than an "unparticularized suspicion" and a "hunch" that McCray was involved in criminal activity. *See Sokolow,* 490 U.S. at 7, 109 S.Ct. 1581 (quoting *Terry,* 392 U.S. at 27, 88 S.Ct. 1868). In fact, their testimony fails to demonstrate any objective basis to believe that criminal activity was afoot at all. The facts in this case, when taken together, simply do not amount to the "minimal level of objective justification" needed to justify subjecting McCray to a *Terry* stop. *See Delgado,* 466 U.S. at 217, 104 S.Ct. 1758.

Instead, it appears that the officers attempted to stop McCray simply because he was young, African–American, on the street at 10:45 p.m. on a summer night in his own neighborhood, and possibly near an alleged nefarious character. It is unfortunate that individuals must reside in neighborhoods with a high degree of drug traffic. Indeed, "People who live in communities torn by [crime] are entitled to be free from fear of victimization and have police investigate before [crimes] occur." *Valentine,* 232 F.3d at 356. However, it

would be even more unfortunate if people who live in neighborhoods afflicted with crime are made to live in fear of victimization by those sworn to protect them from crime as well as the criminals. In other words, it is better "to frustrate the prosecution of an individual who may be guilty so that innocent citizens need not be fearful of a police stop and frisk." *See United States v. Carter,* 1999 WL 1007044; *see also In re Winship,* 397 U.S. 358, 372, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring) (emphasizing that it still remains "a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free."). In keeping with the Supreme Court's decision in *Brown v. Texas,*[14] the court will not countenance unjustified stops of individuals, even those who may have committed a crime, merely because they have the misfortune of living in neighborhoods with a high degree of drug traffic.

### B. Exclusionary Rule

 Because the officers' stop of McCray was not supported by reasonable suspicion, the court holds that the stop violated the Fourth Amendment. "The exclusionary rule mandates that evidence derived from constitutional violations may not be used at trial because illegally derived evidence is considered 'fruit of the poisonous tree.' " *United States v. Pelullo,* 173 F.3d 131, 136 (citing *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)).

 The Supreme Court in *Wong Sun* explained that it is important to determine whether the derived evidence came directly from the exploitation of the constitutional violation or whether the de-

---

**14.** 443 U.S. at 52, 99 S.Ct. 2637 (holding that an area's reputation for criminal activity alone cannot justify an investigatory stop).

rived evidence was obtained "by means sufficiently distinguishable to be purged of the primary taint." 371 U.S. at 488, 83 S.Ct. 407. Because the court holds that the officers stopped McCray illegally, the Government bears the burden of proving that the McCray intended to voluntarily abandon the gun. *See United States v. Vasquez De Reyes*, 149 F.3d 192, 194 (3d Cir.1998). The Government contends that in light of *Hodari D.*, McCray voluntarily abandoned the gun because he disposed of it before he was actually seized. *See id.* 499 U.S. at 628, 111 S.Ct. 1547 (holding that drugs thrown away by a fleeing defendant before he was subdued by police were voluntarily abandoned, and thus, admissible). The court is not persuaded by this argument. Only Officer Muniz saw McCray allegedly discard the weapon. All testimony indicates that the lighting was dim, Officer Prado was not focused on McCray, and Wallace's testimony again contradicts Muniz's. Given the court's assessment of the credibility of the officers' and Wallace's testimony, the court concludes that the Government has not carried its burden and, therefore, has not established that McCray abandoned the gun before the scuffle broke out. Therefore, the court finds that the gun was obtained as a result of an illegal stop. Accordingly, all items seized and statements [15] made by McCray were derivative of the illegal stop, and thus, they will be suppressed as "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. at 488, 83 S.Ct. 407.

## IV. CONCLUSION

Because the officers' stop of McCray was not justified by reasonable suspicion all tangible evidence seized and statements

---

**15.** McCray's statements will be suppressed as derivative of the unlawful stop. Thus, the court will not address whether his statements

made by McCray while in custody were derivative of and, therefore, tainted by, the illegal stop. Thus, the court will grant McCray's motion and will issue an order to this effect in conjunction with this opinion.

### *ORDER*

For the reasons stated in the court's memorandum opinion of this date, IT IS HEREBY ORDERED that the Motion to Suppress (D.I.13) filed by the defendant Cyril McCray is GRANTED.

were involuntary and made in violation of *Miranda*. *See United States v. Carter*, 1999 WL 1007044, at *7–8 n. 19.